**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ERIC HU,
EDWIN ANTONIO SURIS,
TIMOTHY SMITH,
ROY NORMAN MORROW,
MING HUI LIN,
NANCY BATALAS,
JAMES LAFATA,
DANIEL DAVID KATTAN,
TRACY EVETTE STARLING,
CHRISTOPH B. OH,
HECTOR ANDREW CORDERO,
YO-YO CHEN,
MANISHA REDDY NARAYAN,
on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WHALECO, INC., d/b/a Temu,

Defendant.

Case No. 23-cv-06962-MKB-RML

***ZIBOUKH* PLAINTIFFS' *AMICUS CURIAE* BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**


INTRODUCTION AND INTEREST OF *AMICI CURIAE* ....................................................... 1

LEGAL STANDARD ........................................................................................................ 4

I. THE TERMS OF USE, INCLUDING THE ARBITRATION CLAUSE, ARE UNENFORCEABLE BECAUSE DEFENDANTS FAILED TO PROVIDE PLAINTIFFS ADEQUATE NOTICE OF THE TERMS. ............................ 4

A. Two Federal Courts Have Already Held That Temu's Terms Are Unenforceable. ..................................................................................... 5

B. The Decisions Holding The Terms Unenforceable Were Correctly Decided. ............................................................................................ 7

II. THE ARBITRATION CLAUSE IS UNENFORCEABLE UNDER THE TERMS' PLAIN LANGUAGE. ...................................................................... 15

III. THE LACK OF CLARITY, AND INTERNAL INCONSISTENCY, OF THE TERMS PRECLUDED THE MUTUAL ASSENT NECESSARY FOR CONTRACT FORMATION. .................................................................. 16

IV. DEFENDANTS' NOVEL BATCH ARBITRATION CLAUSE IS BOTH PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE. ...................... 18

A. The Arbitration Clause Is Procedurally Unconscionable. .................................. 19

B. The Arbitration Clause Is Substantively Unconscionable. ................................ 21

V. DISCOVERY WOULD FURTHER DEMONSTRATE THE ARBITRATION CLAUSE'S UNENFORCEABILITY. ............................................. 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Achey v. Cellco P'ship*,
293 A.3d 551 (2023) ....................19

*Applebaum v. Lyft, Inc.*,
263 F. Supp. 3d 454 (S.D.N.Y. 2017)....................5, 6, 7, 9

*Arnaud v. Doctor's Assocs. Inc.*,
2019 WL 4279268 (E.D.N.Y. Sept. 10, 2019) ....................5, 9

*Berkson v. Gogo LLC*,
97 F. Supp. 3d 359 (E.D.N.Y. 2015) .................... *passim*

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................9

*Cap Gemini Ernst & Young, U.S., LLC v. Nackel*,
346 F.3d 360 (2d Cir. 2003)....................18

*China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*,
803 Fed. Appx. 481 (2d Cir. 2020)....................15

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018)....................9, 12, 14

*De Jesus v. Gregorys Coffee Mgmt., LLC*,
2021 WL 5391026 (E.D.N.Y. Nov. 29, 2021)....................3, 18

*Dedon GmbH v. Janus et Cie*,
411 Fed. Appx. 361 (2d Cir. 2011)....................5

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022) ....................2

*Doffing v. Meta Platforms*,
2022 WL 3357698 (D. Or. July 20, 2022)....................2

*Eakins v. Whaleco Inc.*,
2024 WL 1190766 (W.D. Okla. Mar. 5, 2024).................... *passim*

*F.T. Maritime Services Ltd. v. Lambda Shipholding Ltd.*,
533 F. Supp. 3d 149 (S.D.N.Y. 2021)....................15

*Feld v. Postmates, Inc.*,
442 F. Supp. 3d 825 (S.D.N.Y. 2020)....................12

*Fontanez v. Whaleco, Inc.*,
No. 53-2023CA000374 (Fla. Cir. Cit. Aug. 29, 2023)....................12, 13, 14

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)....................12

*Heckman v. Live Nation Entertainment, Inc.*,
686 F. Supp. 3d 939 (N.D. Cal. 2023).................... *passim*

*Hines v. Overstock.com, Inc.*,
668 F. Supp. 2d 362 (E.D.N.Y. 2009)....................5

*Jackson v. Amazon, Inc.*,
65 F.4th 1093 (9th Cir. 2023)....................25

*Johnson v. Whaleco Inc.*,
2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023).................... *passim*

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022)....................19, 22, 24, 25

*Meeg v. Heights Casino*,
2020 WL 1493658 (E.D.N.Y. Mar. 27, 2020)....................16

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)....................11, 12, 13, 25

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)....................10

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016).................... *passim*

*Pepper v. Fluent Inc.*,
2023 WL 4561798 (S.D.N.Y. July 17, 2023)....................4

*Plazza v. Airbnb, Inc.*,
289 F. Supp. 3d 537 (S.D.N.Y. 2018)....................12

*Sablosky v. Edward S. Gordon Co.*,
535 N.E.2d 643 (N.Y. 1989)....................18

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021)....................10

*Specht v. Netscape Comm'cns Corp.*,
306 F.3d 17 (2d Cir. 2002)....................4, 5, 16

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019).................... *passim*

*Wilson v. Redbox Automated Retail, Inc.*,
448 F. Supp. 3d 873 (N.D. Ill. 2020)....................10

*Zachman v. Hudson Valley Fed. Credit Union*,
49 F.4th 95 (2d Cir. 2022)....................25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3)....................24

Federal Rule of Civil Procedure 11 (b)....................24

Rule 11....................24

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

Amici are plaintiffs who had their private information misappropriated by the Temu app and brought suit in the related *Ziboukh* litigation (the "*Ziboukh* Plaintiffs").[1] Temu is an online shopping app that offers low-cost goods made in China and is one of the most popular apps in the United States. Experts who have examined Temu have concluded that it is a "dangerous" app that "'bypasses' phone security systems to read a user's private messages, make changes to the phone's settings and track notifications,"[2] and gains access to "literally everything on your phone."[3] Experts have also found that "Temu misled people about how it uses their data."[4]

Government experts agree. For example, in April 2023, a U.S.-China Economic and Security Review Commission report found that Temu posed significant data risks;[5] in May 2023, the State of Montana banned Temu from government devices because of the "risk of foreign adversaries obtaining Montanans' personal, private, sensitive information and data";[6] in December 2023, Congress demanded that Defendants produce information regarding Temu's data collection practices, noting "Security officials have cited concerns about Temu and the amount of data collected" and that Congress was "concerned that China may be able to exploit lax data security practices or backdoors to access user information, much like the concerns we

---

[1] See Ziboukh et al v. Whaleco Inc. et al, No. 24-cv-3733-MKB-RML.

[2] After TikTok, Montana Bans WeChat, Temu And Telegram From Government Devices, Int'l Bus. Times (May 18, 2023), https://www.ibtimes.com/after-tiktok-montana-bans-wechat-temu-telegram-government-devices-3694060.

[3] Get Temu, the Popular Shopping App, Off Your Phone Now, KimKomando (Apr. 15, 2023), https://www.komando.com/tips/software-and-apps/temu-security-concerns/.

[4] Apple, for example, reportedly found recently that Temu "violated the company's mandatory privacy rules." Booming Chinese Shopping App Faces Western Scrutiny Over Data Security, Politico (July 24, 2023), https://www.politico.eu/article/booming-chinese-shopping-app-temu-faces-western-scrutiny-over-data-security-2/.

[5] U.S.-China Econ. Sec. Rev. Comm'n, Shein, Temu, and Chinese e-Commerce: Data Risks, Sourcing Violations, and Trade Loopholes (Apr. 14, 2023), https://www.uscc.gov/research/shein-temu-and-chinese-e-commerce-data-risks-sourcing-violations-and-trade-loopholes.

[6] After TikTok, *supra* note 1.

have raised regarding TikTok"[7]; and on June 25, 2024 the State of Arkansas filed an enforcement action alleging that Temu is a "data-theft business that sells goods online as a means to an end."[8]

The *Ziboukh* Plaintiffs are victims of Temu's data practices. The *Ziboukh* complaint includes a class of Temu users, a class of minor Temu users, and a class of non-users who had their electronic communications with Temu users collected by the app. While there are issues that are unique to these classes that independently bar arbitration, and Defendants apparently concede that the claims brought by non-users are not arbitrable,[9] there are several common reasons that the motions to compel arbitration in this case and *Ziboukh* should be denied.

*First*, as two other federal courts have already held, Defendants failed to give consumers adequate notice of Temu's Terms of Use, including the arbitration clause, and they are therefore unenforceable. *Eakins v. Whaleco Inc.*, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024); *Johnson v. Whaleco Inc.*, 2023 U.S. Dist. LEXIS 184104 (M.D. Fla. Oct. 13, 2023). Those well-reasoned decisions are correct.

*Second*, the fact that these decisions have been issued makes Temu's arbitration clause unenforceable on its face. The Terms provide that, in the event Temu's "batch arbitration" provision is determined to be invalid or unenforceable, the entire arbitration clause shall be void

---

[7] Committee on Energy and Commerce, letter (Dec. 20, 2023), https://d1dth6e84htgma.cloudfront.net/CCP_Marketplace_Letter_to_Whaleco_Inc_Temu_7f921e1a67.pdf.

[8] Attorney General Griffin Press Release (June 25, 2024), https://arkansasag.gov/news_releases/attorney-general-griffin-sues-chinese-e-commerce-company-temu-for-deceiving-arkansans-illegally-accessing-their-personal-information/. As these materials demonstrate, Defendants' suggestion that the allegations are "premised on baseless conjecture" or "lifted extensively from a report by a known short-seller" are inaccurate.

[9] There are multiple additional reasons *Ziboukh* Plaintiffs' claims are not arbitrable. For example: First, unlike the *Hu* Plaintiffs, *Ziboukh* Plaintiffs name PDD Holdings, Inc. as a Defendant; PDD Holdings, Inc. is not a party to the Terms and thus Plaintiffs never agreed to arbitrate any claims against it. Second, the non-user Plaintiffs never agreed to the Terms and so cannot be compelled to arbitrate. Third, any arbitration agreement with minor users is void or voidable. *See, e.g.*, *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1256 (N.D. Cal. 2022) (child "would not be on inquiry notice that she was assenting to" online terms); *Doffing v. Meta Platforms*, 2022 WL 3357698, at *6 (D. Or. July 20, 2022) (online terms "procedurally unconscionable, substantively unconscionable, and unenforceable against a minor").

and unenforceable. (7/8/23 Terms § 20.11, Ex. A.)[10] That is the case here, given the rulings holding the Terms as a whole, including the batch arbitration provision, are unenforceable. Nonetheless, even in the absence of such language, Defendants would be prohibited from enforcing the Terms under the doctrine of collateral estoppel.

*Third*, the Terms are so internally inconsistent and unworkable that there could be no "meeting of the minds" necessary for contract formation. The lengthy arbitration provisions purport to require arbitration in "batches" while simultaneously requiring "individual" arbitration and prohibiting "mass arbitration." In doing so, the arbitration clause purports to incorporate the AAA rules, which in turn do not provide for "batch" arbitration at all. These and many other inconsistencies are apparent on the face of the Terms, which are so complex and unworkable that they precluded consumers from understanding what precisely they were agreeing to.

*Fourth*, no enforceable agreement was formed because the arbitration clause is procedurally and substantively unconscionable. The clause seeks to substitute Plaintiffs' right to pursue litigation with a novel "batch arbitration" procedure that deprives consumers of their ability to obtain relief. Multiple courts have ruled such provisions unenforceable. Indeed, the clause here implicitly acknowledges the potential invalidity of these procedures, stating that the entire agreement is void if the "batch arbitration" procedure is held unenforceable. (*Id.* § 20.11.)

*Finally*, while the arbitration clause is unenforceable on its face, discovery would undoubtedly further demonstrate that Defendants' motion should be denied.

[10] Defendants rely on a version of the Terms created after *Hu* and *Ziboukh* were filed. Ex. B. to Def. Mot. However, "'Arbitration agreements signed after litigation is commenced are deemed unconscionable and thus unenforceable.'" *De Jesus v. Gregorys Coffee Mgmt., LLC*, 2021 WL 5391026, at *5 (E.D.N.Y. Nov. 29, 2021). Nonetheless, the motion should be denied regardless of which version of the Terms is applied.

## LEGAL STANDARD

"The threshold question of whether the parties … agreed to arbitration is determined by state contract law principles." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). "'Under New York law, the party seeking arbitration bears the burden of proving that a valid arbitration agreement exists … by a preponderance of the evidence.'" *Pepper v. Fluent Inc.*, 2023 WL 4561798, at *7 (S.D.N.Y. July 17, 2023), quoting *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 700-01 (S.D.N.Y. 2017). Thus, the moving party "'must prove by a preponderance of the evidence that all the elements necessary to form a valid contract are met, *namely offer, acceptance, consideration, mutual assent, and intent to be bound.*'" *Id.*

"Courts deciding motions to compel [arbitration] apply a standard similar to the one applicable to a motion for summary judgment." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019); Def. Mot. at 5. Under this standard, courts "draw[] all reasonable inferences in favor of the non-moving party." *Id.* "[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," and courts must "decide whether the parties to a contract have agreed to arbitrate disputes." *Id.* at 288. "[A] party cannot be required to submit to arbitration any dispute which the party has not agreed so to submit." *Specht v. Netscape Comm'cns Corp.*, 306 F.3d 17, 26-27 (2d Cir. 2002).

### I. The Terms Of Use, Including The Arbitration Clause, Are Unenforceable Because Defendants Failed To Provide Plaintiffs Adequate Notice Of The Terms.

The Second Circuit has held that in order for online terms of use to be enforceable, there must be "clear and conspicuous" notice of the terms. *Starke*, 913 F.3d at 293. "[A] contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Id.* at 288-89. In the web-based context, inquiry notice requires that "the design and content of the relevant interface" present the arbitration provision "in a clear and conspicuous way." *Id.* at 289. "Clarity and

conspicuousness of arbitration terms are important in securing informed assent." *Specht*, 306 F.3d at 30. "[W]here a party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence." *Dedon GmbH v. Janus et Cie*, 411 Fed. Appx. 361, 363 (2d Cir. 2011).

Accordingly, courts within this circuit have repeatedly held that no contract is formed, and arbitration must be denied, where (as here) the presentation of online terms through hyperlinks or otherwise is not sufficiently conspicuous to put consumers on inquiry notice of the terms. *See, e.g.*, *Starke*, 913 F.3d at 294 (terms unenforceable where hyperlink was "spacially decoupled" from portion of website requiring users' assent); *Specht*, 306 F.3d at 31-32 (no inquiry notice of terms provided via hyperlink at bottom of webpage); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236 (2d Cir. 2016) (hyperlink not sufficiently conspicuous where it was not "directly adjacent" to button manifesting assent); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466–67 (S.D.N.Y. 2017) (terms unenforceable where the hyperlink was "in the smallest font on the screen"); *Arnaud v. Doctor's Assocs. Inc.*, 2019 WL 4279268, at *6 (E.D.N.Y. Sept. 10, 2019) (hyperlink not "clear and conspicuous"); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (same); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (terms unenforceable where hyperlink not prominently displayed).

### A. Two Federal Courts Have Already Held That Temu's Terms Are Unenforceable.

Applying these principles, two federal district courts have already held that Temu's Terms of Use are unenforceable and denied Defendants' motions to compel arbitration. In *Johnson*, the court concluded that the hyperlink to the Terms was not "sufficiently conspicuous" and consumers were not "put on notice to the Agreement with Defendant and cannot be compelled to arbitrate this dispute." 2023 U.S. Dist. LEXIS 184104, at *7, **9-10. Specifically,

the court found that the presentation of the hyperlink appeared to be purposefully designed to evade consumers' notice: "Most damning to Defendants' attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous cues." *Id.* at **7-8. "This camouflaged font contradicts Defendant's assertion that its registration page displays a 'conspicuous hyperlink to [it]s Terms of Use…. And crucially—it evinces an intent to ***conceal*** those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate." *Id.* at *8.

In addition, the court found that "[t]he inconspicuous nature of the hyperlinks is further compounded by its poor placement on the website." *Id.* As the court explained, "Here, the faint text linking to Defendant's browsewrap agreement is located at the bottom of the webpage beneath four other buttons and far below the bright-orange 'Continue' button… . This placement does not put a reasonably prudent user on inquiry notice." *Id.* at *9. Accordingly, the court concluded that "'the hyperlink to the Terms is not prominent or particularly remarkable at the bottom of the page[] where it is featured,'" *id.* at *7, and "does not put a reasonably prudent user on inquiry notice," *id.* at *9. "'It is not reasonable to expect a user to continue reading below the highly conspicuous purchase button.'" *Id.* at *8.

In *Eakins*, the court likewise denied Defendants' motion to compel arbitration, holding that plaintiff did not receive "reasonably conspicuous notice that she was agreeing to Defendant's terms." 2024 WL 1190766, at *2. As the court noted, "parties must manifest their mutual assent to the essential terms of an agreement." *Id.*, citing *Starke*, 913 F.3d at 288-89. The court concluded that no such assent could occur given the presentation of Temu's Terms.

"For starters, the terms of use agreement appears in relatively small font at the bottom of the screen—spacially decoupled from the attention-grabbing orange 'Continue' button that users

click to create their account." *Id.*, citing *Starke*, 913 F.3d at 294; *Applebaum*, 263 F. Supp. 3d at 466-67. The court concluded that the presentation was thus similar to those found inadequate in *Starke* where there was similar "decoupling" of the hyperlink and button manifesting consent, and in *Applebaum* where the hyperlink was similarly presented in small font.

As the court further observed, "Most glaring, however, is the App's failure to distinguish the 'Terms of Use' hyperlink from the surrounding text." *Id.* at *4. Citing numerous decisions finding similar presentations of hyperlinked terms unenforceable, the court observed that "[t]he notice here appears in grey font against a white backdrop, and while 'Terms of Use' is a darker shade of grey, the contrast is neither remarkable nor presents with the traditional hallmarks of a hyperlinked text." *Id.* As the court noted, "Courts have generally 'required more than mere coloring to indicate the existence of a hyperlink to a contract'" and "the App's failure to adequately distinguish the hyperlinked text coupled with its obscure placement of the terms of use agreement, fails the conspicuous test." *Id.*, quoting *Applebaum*, 263 F. Supp. 3d at 467.

**B. The Decisions Holding The Terms Unenforceable Were Correctly Decided.**

The rulings in *Johnson* and *Eakins* are broadly consistent with, and indeed relied on, settled law recognized by courts in the Second Circuit—such as *Starke*, *Applebaum* and *Berkson*—and other jurisdictions. These decisions hold that online terms are unenforceable where, as here, the hyperlink to the terms (1) is not sufficiently conspicuous or (2) is "spacially decoupled" from the button manifesting consent to the terms.[11] For example:

In *Starke*, the Second Circuit held terms unenforceable where "[t]he 'Terms & Conditions' hyperlink was spacially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring [plaintiff's] attention (that is, the

[11] Examples of the prompts at issue in these cases are provided in Exhibit B. (Ex. B).

'Add to Cart' button)." 913 F.3d at 294. The same is true here where the hyperlink for the Terms is at the bottom of the page, far from the "continue" button and separated by multiple other buttons and statements.

However, the presentation of the Terms here is even more problematic than in *Starke* because the "continue" button is adjacent to a prompt requesting that users enter their email or phone number, which in turn is below promotions for "free shipping" and "free returns." Ex. A to Def. Mot.[12] As a result, a reasonably prudent user would likely conclude that by pressing "continue" all they are doing is providing the email or phone number requested in the immediately adjacent text box, or that they are simply acknowledging they will receive "free shipping" or "free returns". Indeed, the Temu prompt appears intentionally designed to avoid alerting the user to any supposed contract formation or contract terms. *Id*.

In *Nicosia*, the Second Circuit similarly ruled that defendant "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration" because the notice of terms was "not directly adjacent" to the button intended to manifest assent. 834 F.3d at 236. Moreover, the court noted that "[t]he message itself—'By placing your order, you agree to Amazon.com's … conditions of use'—is not bold, capitalized, or conspicuous in light of the whole webpage.…" *Id.* at 236-37. As the Second Circuit subsequently reiterated in *Soliman v. Subway Franchising Advertising Fund Trust, Ltd.*, "'even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.'" 999 F.3d 828, 836 (2d Cir. 2021). Rather, in order to provide consumers with adequate notice, the hyperlink itself must be sufficiently conspicuous. The presentation of Terms here, as in *Nicosia*, fails this

[12] As described in the declaration Defendants submitted, "the Registration Prompt contains … a field where the user can enter an email address or phone number to use in registering an account and a ***corresponding*** 'Continue' button." (Trinh Decl. ¶ 7 (emphasis added).)

test because the hyperlink is in small font at the bottom of a page containing a series of buttons and other statements that are in much larger font. In addition, the color of the hyperlinks is similar to the surrounding text, further obscuring the link to the Terms.

The court's ruling in *Applebaum* is consistent with these decisions. There, the court concluded that the terms were unenforceable where language indicating that consumers were "'agree[ing] to Lyft's Terms of Service'" was "in the smallest font on the screen." *Applebaum*, 263 F. Supp. 3d at 466-67. Again, that is also the case here where the statement regarding agreement to the Terms is in the smallest font on the screen.

In *Berkson*, the court similarly found terms unenforceable because the hyperlink to the terms was not sufficiently conspicuous. 97 F. Supp. 3d at 404. Moreover, the court found that "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent … clicking the "SIGN IN' button." *Id.* Here the Terms were even more obscure because the button manifesting consent merely stated "continue" rather than "create account," "sign in," "register" or "I agree".

Finally, in *Arnaud*, the court likewise denied a motion to compel arbitration because the link to the terms was not "clear and conspicuous." 2019 WL 4279268, at *6. As the court there observed, "merely placing the links on the same page as the action button is insufficient to provide inquiry notice." *Id.* Rather, the links must be sufficiently conspicuous in the context of the entire page, and as the courts in *Eakins* and *Johnson* correctly found, that is not the case here.

These rulings are consistent with those from other jurisdictions, which have repeatedly held that presentations similar to Temu's are unenforceable. *See, e.g., Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (terms unenforceable even though underlined: "A web designer must do more than simply underscore the hyperlinked text in order to ensure

that it is sufficiently set apart from the surrounding text."); *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 64 (1st Cir. 2018) (terms unenforceable where "the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention"); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [] agreement."); *Wilson v. Redbox Automated Retail, Inc.*, 448 F. Supp. 3d 873, 883 (N.D. Ill. 2020) (terms unenforceable where "the button for the Terms of Use and accompanying disclosure [was] not adjacent to the 'Pay Now' button"); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 479 (2021) (terms unenforceable where hyperlink was "at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page").

In sum, there are many features of the Temu website that courts have ruled defeat the constructive notice necessary to render terms enforceable, including: (1) the hyperlink to the Terms (and statement regarding assent to the Terms) are not adjacent to the button manifesting assent, but rather at the bottom of the page, (2) the hyperlink to the Terms (and statement regarding assent) are in the smallest font on the page, (3) the hyperlink to the Terms is not distinguishable from the surrounding text (through bright blue coloring or underlining for example), and indeed appears to be purposefully designed to blend in with the surrounding text, (4) there are multiple buttons and statements in larger font appearing between the button manifesting assent and the hyperlink to the Terms (and statement regarding assent), (5) the button manifesting assent does not say "I agree," "Sign up," "Create Account," or "Register," but rather merely states "continue", and (6) in addition to the other buttons and statements on the page,

there are unrelated statements promoting Temu as providing "free shipping" and "free returns".

Defendants' arguments to the contrary all fail. *First*, Defendants' contention that Plaintiffs have "no Second Circuit precedent on their side" (Def. Reply at 8) is inaccurate: decisions like *Nicosia* and *Starke* and many district court decisions within the Second Circuit all support Plaintiffs' position. The cases Defendants cite are easily distinguishable. For example, in *Meyer* the terms were presented in a payment screen where, as Defendants acknowledge, the hyperlink "appears directly below the buttons for registration'"—buttons that (unlike Temu) expressly indicate they "Register" an account. (Def. Mot. at 9, quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 82 (2d Cir. 2017).) Moreover, as is illustrated in the registration screen Defendants attach to their motion (Ex. A to Def. Mot.), the hyperlink to the terms in *Meyer* was in bright blue text and was underlined and capitalized, in contrast to the surrounding text, which was grey. In contrast, the Temu hyperlink was not underlined or capitalized and was similar in color to the surrounding text, which—as the courts in *Eakins* and *Johnson* correctly found—purposefully obscures the hyperlink to the Terms. Likewise, in *Edmundson v. Klarna, Inc.*, the hyperlink to the terms was "set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces' backgrounds" and was "spacially and temporally coupled with the user's transaction," appearing "directly adjacent to the 'button intended to manifest assent to the terms.'" 85 F.4th 695, 706 (2d Cir. 2023). Moreover, as illustrated in the screen attached to Defendants' motion (Ex. A to Def. Mot.), the button manifesting assent did not state merely "continue" but rather "Confirm and continue," further drawing attention to the statement "I agree to the **<u>payment terms</u>**" appearing directly above the button. Moreover, neither presentation contained "extraneous information," such as the

promotions on the Temu prompt. *See id.*[13] In any event, as Defendants and the Second Circuit recognize, "'traditional contract formation law does not vary meaningfully from state to state'" and thus "the Court may consult cases applying the law of other jurisdictions." (Def. Mot. at 6 n.2, quoting *Klarna*, 85 F.4th at 702-03.)

*Second*, Defendants' assertion that the Terms are enforceable because they are allegedly presented as a "sign in", rather than a "browsewrap", agreement is likewise inaccurate. As Defendants' cases recognize, "[t]he categorization of types of web-based contracts … is not dispositive," *Feld*, 422 F. Supp. 3d at 829, citing *Meyer*, 868 F.3d at 76, and indeed, "not all interfaces fit neatly into" these categories, 868 F.3d at 76. In fact, while the *Johnson* court concluded that the agreement was "browsewrap," 2023 U.S. Dist. LEXIS 184104, at *7, and the *Eakins* court found that it was "best characterized as a sign-in wrap," 2024 WL 1190766, at *3 n.4, *both* courts found the Terms unenforceable. Indeed, while Defendants assert that "the Prompt here is a sign-in wrap agreement" (Def. Reply at 2), they previously described it as

[13] The other cases Defendants cite are equally distinguishable. In *Selden v. Airbnb, Inc.*, the court held terms enforceable because the screen "used red to indicate a hyperlink," in contrast to cases like *Cullinane* where the hyperlinks were not set off from surrounding text using a different color and thus were "not conspicuous." 4 F.4th 148, 157 (D.C. Cir. 2021). Indeed, the bright red hyperlinks appeared directly below the "sign in" button. Ex. A to Def. Mot. *Saizhang Guan v. Uber Technologies, Inc.*, held terms enforceable and distinguished cases like *Berkson* on the ground that "Uber drew the drivers' attention to the terms of the Service Agreement with bold, capitalized statements, and twice required the drivers to click 'YES, I AGREE,' a much more explicit form of assent than the single clicking of a 'SIGN IN' button." 236 F. Supp. 3d 711, 724 (E.D.N.Y. 2017). In *Lee v. Ticketmaster, LLC*, the hyperlinks were "displayed in blue font" in both a "sign in" screen and "place order" screen. 817 Fed. App'x 393, 395 (9th Cir. 2020). *Thorne v. Square, Inc.*, involved a cash app where a user "'could not avoid noticing the hyperlink when she registered for an account'" because the notice was provided "in a text containing information integral to a successful Cash App registration," namely "a six-digit sign-in code" that was necessary "to successfully register." 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022). In *Shalomayev v. Altice USA, Inc.*, a sales representative provided consumers a mobile device that displayed "a series of Terms & Conditions," which were also emailed to consumers. 2022 WL 2359406, at *1 (E.D.N.Y. June 30, 2022); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) (hyperlinks "highlighted with blue font and an underline"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) (hyperlinks set off from text and "'spacially coupled' with the sign-up button," appearing "directly above"); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (hyperlink underlined and "immediately below" button).

"browsewrap",[14] and the prompt nowhere states that users are "signing in" or "registering" an account much less pushing a "sign in" or "sign up" button as in Defendants' examples (*id.*).

Moreover, contrary to Defendants' suggestion (Def. Mot. at 7), courts have indicated that "sign-in" wraps can be even more problematic because they can affirmatively mislead consumers. In *Berkson*, for example, the court described such agreements as a "questionable form of internet contracting": "A questionable form of internet contracting has been used in recent years—sign-in-wraps. These internet consumer contracts do not require the user to click on a box showing user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." 97 F. Supp. 3d at 399. In any event, as the Second Circuit has observed, what matters is the design and presentation of the Terms—not the characterization of the agreement, *Meyer*, 868 F.3d at 76—and here courts have concluded that the design and presentation of the Terms does not provide users adequate notice.

*Third*, Defendants' assertion that the Temu website is not "cluttered" (Def. Mot. at 10; Def. Reply at 1) is inaccurate. As noted, the link to Temu's Terms appears in small grey font that is separated from the giant, bright orange "Continue" button by four other buttons (also brightly colored, featuring the logos of Google, Facebook, Twitter, and Apple). Moreover, the "continue" button is immediately below a text box requiring entry of users' email or phone number in order to continue to the next page, and in turn that text box is below unrelated promotions of "free shipping" and "free returns" that further obscure the hyperlinked Terms.[15]

In fact, the Temu website is highly cluttered: "Temu has gamified its site. Pop-ups with

[14] In *Fontanez,* Defendant Whaleco characterized the agreement as "browsewrap", stating: "A 'browsewrap' agreement occurs when a website or mobile app provides a link to the terms and conditions and allows the purchaser to complete the transaction without visiting the page containing the term and conditions." Def. Mot. at 7-8, *Fontanez v. Whaleco,* Ex. C.

[15] Nor is the issue simply that the link is at the "bottom" of the page (Def. Reply at 5-6)—it is that it is separated from the "continue" button by a series of intervening buttons and text.

wheels to spin for discounts, tokens to collect, and countdown clocks make it seem like time on offers is running out, but they're designed to push customers toward purchases."[16] In addition to the promotions on the Temu prompt, the general gamified nature of the website only adds to the clutter, which in turn further undermines any claim consumers were provided adequate notice. *Nicosia* 834 F.3d at 236; *Cullinane*, 893 F.3d at 63-64.

*Fourth*, for the reasons discussed above, the courts in *Eakin* and *Johnson* properly rejected the Florida state court's decision in *Fontanez*. (Def. Reply at 8, citing *Fontanez v. Whaleco, Inc.*, No. 53-2023CA000374 (Fla. Cir. Cit. Aug. 29, 2023).) Moreover, as the court in *Eakins* observed, *Fontanez* is further distinguishable because the plaintiff "had already filed 'eleven class action lawsuits,' and the 'reasonable inference [was] that … [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements.'" *Eakins*, 2024 WL 1190766, at *4; *Johnson*, 2023 U.S. Dist. LEXIS 184104, at *9 n.8.

*Finally*, the cases cited above refute Defendants' contention that the *Hu* Plaintiffs are merely "nitpick[ing]" the Temu prompt. (Def. Reply at 1.) The features Plaintiffs identify are the same features courts have repeatedly held render notice inadequate. Moreover, it appears that Defendants have made at least some effort to correct some (but not all) of the deficiencies in the registration prompt for future users. As Defendants note in a footnote in the declaration they submitted, in October 2023 after this lawsuit was filed (and the same month *Johnson* held that Temu's Terms were unenforceable), Defendants made what they characterize as "cosmetic" changes to the Temu prompt. (Trinh Decl. at 2 n.1.) As a result, users who sign up for Temu in the future will be presented with hyperlinks to the Terms that are a bright blue color,

[16] What is Temu? Read Before You "Shop Like a Billionaire," PC Magazine, Nov. 22, 2023, https://www.pcmag.com/how-to/what-is-temu-read-before-you-shop-like-a-billionaire.

distinguishing them from the surrounding text.[17]

## II. The Arbitration Clause Is Unenforceable Under the Terms' Plain Language.

The recent decisions holding the Terms unenforceable are not merely persuasive authority. They are dispositive given the Terms' plain language stating that the arbitration clause is unenforceable where such rulings have been issued. Specifically, Section 20.11 provides that the entire arbitration clause is unenforceable if the batch arbitration provisions in Section 20.9 are invalidated. (7/8/23 Terms § 20.11, Ex. A.) As Defendants underscored in a subsequent revision of the Terms, if the "batch arbitration" provision "is found under the law to be invalid or unenforceable ***to any extent***, then you agree that the entire Arbitration Agreement shall be of no force and effect." (2/1/24 Terms § 19.11, Ex. B to Def. Mot. (emphasis added).) Here, two courts have ruled the batch arbitration provision (and the rest of the Terms)—are unenforceable. Thus, under the Terms' plain language, the arbitration agreement has "no force and effect."

Even absent this dispositive language, however, the recent decisions would have preclusive effect under the doctrine of collateral estoppel. The presentation of the Terms here and in *Johnson* and *Eakins* are identical. (*See* Comparison, Ex. D.) Moreover, as Defendants acknowledge and the Second Circuit has ruled, "'traditional contract formation law does not vary meaningfully from state to state.'" (Def. Mot. at 6 n.2, quoting *Klarna*, 85 F.4th at 702-03.) Accordingly, the law and facts are essentially the same, and the *Johnson* decision has been reduced to a final judgment, as the parties settled that case after the court denied Defendants' motion to compel arbitration. *See China Shipping Container Lines Co. Ltd. v. Big Port Serv. DMCC*, 803 Fed. Appx. 481, 484 (2d Cir. 2020) (collateral estoppel "preclude[d] [party] from

[17] Defendants' claim that *Eakins* and *Johnson* relied on "low-resolution copies of Temu's registration screen" (Def. Reply at 9 n.4) is wrong. Moreover, Defendants had full opportunity to submit whatever they wanted to those courts and litigate the issues before those them.

relitigating the existence of an arbitration agreement" where prior ruling held no agreement to arbitrate existed); *F.T. Maritime Services Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149, 156 (S.D.N.Y. 2021) (collateral estoppel barred petition to compel arbitration; prior ruling precluded re-litigating "whether an arbitration agreement exists").

**III. The Lack of Clarity, and Internal Inconsistency, of The Terms Precluded The Mutual Assent Necessary For Contract Formation.**

Defendants' motion fails for an additional, independent reason. Had consumers been given adequate notice of the Terms, Defendants' attempt to enforce them would still fail because they are so convoluted and internally inconsistent that there could be no "'meeting of the minds' and 'a manifestation of mutual assent,'" as required under New York law. *Starke*, 913 F.3d at 293, citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999). In particular, "[c]larity and conspicuousness of arbitration terms are important in securing informed assent." *Specht*, 306 F.3d at 30. "Under New York law, a court may only compel arbitration when 'the evidence establishes … [a] clear, explicit and unequivocal agreement to arbitrate.'" *Meeg v. Heights Casino*, 2020 WL 1493658, at *3 (E.D.N.Y. Mar. 27, 2020), quoting *Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144 (2008).

Here, however, the Terms are far from clear. The arbitration clause specifies that arbitration proceed through a novel "batch" arbitration procedure, yet at the same time specifically states that claims shall proceed on an "individual" basis and prohibits "mass arbitration." Specifically, the clause states that "you and Temu will only be permitted to pursue disputes or claims and seek relief against the other party on an ***individual basis***" (7/8/23 Terms § 1.6, Ex. A), emphasizes that claims may be brought "***ONLY ON AN INDIVIDUAL BASIS***," states that claims "**CANNOT BE ARBITRATED OR CONSOLIDATED** WITH THOSE OF ANY OTHER CUSTOMER OR USER" (*id.* § 20.4), and states "[t]his Batch Arbitration

provision ***shall in no way*** be interpreted as authorizing a class, ***collective and/or mass arbitration*** or action of ***any kind***" (*id.* § 20.9) (emphasis added).

However, the AAA rules that the clause incorporates do not mention "batch arbitration" at all. Instead, they provide procedures for "consumer arbitration" and supplementary rules for "mass arbitration" of consumer claims. *See* https://adr.org/consumer, Ex. E; Consumer Arb. Rules, Ex. F; Mass Arb. Rules, Ex. G. While "mass arbitration" is prohibited by the Terms, the AAA applies its "mass arbitration" rules whenever there are "twenty-five or more Consumer or Employment/Workplace similar Demand for Arbitration (Demand(s)) filed against or on behalf of the same party or related parties." Ex. G, at 4. Thus, the AAA rules are in direct conflict with the Terms, which point consumers to the AAA's website and ask them to parse through the irreconcilable inconsistencies themselves. (7/8/23 Terms § 20.5, Ex. A.)

Similarly, while the arbitration clause states that arbitrations will proceed in "batches" that include 100 claimants each and for which AAA will charge "one set of filing and administrative fees" (*id.* § 20.9), again, the AAA rules contain no such procedures. While the AAA provides a discounted rate for the fees it charges plaintiffs and defendants for "mass arbitrations," the fee is a per claimant fee that varies depending on the total number of claimants—and, again, the Terms expressly prohibit "mass arbitration." *See* Exs. E, H & I

Finally, while the arbitration clause suggests that the parties will somehow agree to send each "batch" arbitration to a forum that is convenient for all 100 claimants in the batch, the AAA rules again appear to provide differently. Specifically, the arbitration clause states that "For all actions under the Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent

circumstances." (7/8/23 Terms § 20.5, Ex. A.) However, the AAA rules provide that the location of the arbitration will be selected by the arbitrator. *See* Ex. F, p. 15. Accordingly, there are multiple areas in which the arbitration clause is at odds with the AAA rules that govern the arbitration.

## IV. Defendants' Novel Batch Arbitration Clause Is Both Procedurally And Substantively Unconscionable.

Defendants' motion further fails because the arbitration clause is both substantively and procedurally unconscionable. Indeed, the Terms implicitly acknowledge that the novel procedures they adopt may be unenforceable, providing that if the batch arbitration provision is ruled invalid, the entire arbitration clause will be void.[18] (7/8/23 Terms § 20.11, Ex. A.)

"The doctrine of unconscionability 'seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties.'" *De Jesus*, 2021 WL 5391026, at *7. "The question of unconscionability of an arbitration agreement must be resolved first, 'as a matter of state law, before compelling arbitration pursuant to the FAA.'" *Id.* at *4; *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003).

"Courts do not enforce terms of agreements that are unconscionable…. Whether procedural unconscionability exists is determined by what led to the formation of the contract…. Substantive unconscionability is essentially an issue of the reasonableness of a term." *Berkson,* 97 F. Supp. 3d at 391; *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643, 647 (N.Y. 1989).

The novel and one-sided arbitration clause here increases the burdens on consumers,

[18] When *Hu* and *Ziboukh* were filed, the Terms provided: "Except as provided in Section 20.9 [batch arbitration], if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect." 7/8/23 Terms § 20.11, Ex. A. After the lawsuits, the following was added: "For the avoidance of doubt, this means that, if Section 19.9 is found under the law to be invalid or unenforceable to any extent, then you agree that the entire Arbitration Agreement shall be of no force and effect." 2/1/24 Terms § 19.11, Ex. B to Def. Mot.

effectively frustrating their ability to bring claims. It is part of a trend among companies seeking to employ "strategies for deterring and defending against mass arbitrations, primarily through the careful drafting of their arbitration agreements."[19] The clause supplants the time-tested procedural mechanism of class litigation with complicated and unclear arbitration procedures that deter Plaintiffs from pursuing their rights by requiring them to jump through multiple hoops and navigate costly and one-sided procedures. Indeed, the one-sided nature of the clause is powerfully evidenced by the fact that Defendants are unwilling to arbitrate at all if the batch arbitration procedures are ruled unenforceable to any extent. (7/8/23 Terms § 20.11, Ex. A.)

Courts have rejected such novel "batch arbitration" procedures as substantively and procedurally unconscionable in a series of recent cases. *See, e.g.*, *Heckman v. Live Nation Entertainment, Inc.*, 686 F. Supp. 3d 939 (N.D. Cal. 2023); *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040-41 (N.D. Cal. 2022); *Achey v. Cellco P'ship*, 293 A.3d 551, 558 (2023)(clause has "a systematic effect to impose arbitration on a customer as an inferior forum").

### A. The Arbitration Clause Is Procedurally Unconscionable.

The procedural component of unconscionability "focuses on the factors of oppression and surprise." *Heckman*, 686 F. Supp. 3d at 952. "'Oppression results where there is no real negotiation of contract terms because of unequal bargaining power.'" *Id.* "'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.'" *Id.* Multiple courts have found batch arbitration procedures like those here procedurally unconscionable.

In *Heckman*, for example, the court found a batch arbitration clause "procedurally

[19] As Mass Arbitrations Proliferate, Companies Have Deployed Strategies for Deterring and Defending Against Them (May 24, 2021), https://www.gibsondunn.com/as-mass-arbitrations-proliferate-companies-have-deployed-strategies-for-deterring-and-defending-against-them/.

unconscionable to an extreme degree" where the clause "was presented on a take-it-or-leave-it basis" and was "oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.'" *Id.* Among other things, the court observed that the clause represented "a significant change in the parties' agreement (from individual, bilateral arbitration to mass arbitration)" and that the "true nature of this change" was "bur[ried]" in the arbitration provider's "difficult-to-parse Rules". *Id.* The court found that even if consumers "were to review the revised TOU, it is doubtful that they would understand that they were agreeing to resolve their claims in a novel mass arbitration procedure." *Id.* at 956. The terms stated "quite confusingly, that all claims will be resolved by 'individual arbitration,' and not 'in any purported class or representative proceeding.'" *Id.* Moreover, "to discover what they were actually agreeing to, users would need to parse through … separately posted Rules and comprehend their implications (no small task …)." *Id.*

The same problems exist here. Consumers must not only follow a hyperlink to the Terms containing the arbitration clause, but they then must follow yet another link to the AAA's website and ascertain which rules on that site govern their arbitration and find another link to the 38 pages of consumer arbitration rules that the clause specifies will govern the arbitration.[20] Once they perform this task, as noted above, consumers will find that the arbitration clause is inconsistent with these rules and riddled with internal inconsistencies that make it impossible for an ordinary consumer to understand its terms and provide any valid consent to arbitration.

The lack of clarity is compounded by the fact that Defendants have made multiple amendments to the arbitration clause. As in *Heckman*, Defendants gave themselves the right to

[20] "The arbitration will be conducted by American Arbitration Association (the 'AAA'), an established alternative dispute resolution provider, under its rules, including Consumer Arbitration Rules (the 'AAA Rules'), then in effect, unless otherwise required by law. AAA's rules are also available at https://adr.org/consumer, or by calling 1-800-778-7879." Ex. A, § 20.5.

unilaterally amend the arbitration clause, and the clause assumes that consumers consent to such unilateral changes by merely continuing to use the site. (7/8/23 Terms § 1.7, Ex. A.) These unilateral amendments have included switching the company that provides arbitration services, which resulted in a wholesale change in the rules that would govern the arbitration. Specifically, Defendants switched from JAMS (9/1/22 Terms § 20.5, Ex. J), which as *Heckman* observed, historically "did not provide for a grouping of individual consumer claims," 686 F. Supp. 3d at 951, to the AAA rules which likewise do not provide for "batch" arbitration, but do provide for "mass arbitration," which is prohibited by the arbitration clause here.

**B. The Arbitration Clause Is Substantively Unconscionable.**

The arbitration clause further fails because it is substantively unconscionable. "'Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.'" *Heckman*, 686 F. Supp. 3d at 957. "'As with any contract, the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided.'" *Id.* Where the terms "exhibit[] an extremely high degree of procedural unconscionability, 'even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable.'" *Id.*

The clause here is purposefully designed to make resolution of large numbers of relatively low-dollar consumer claims impractical. Defendants would require millions of individual consumers to jump through a series of costly, time-consuming, and one-sided procedures designed to frustrate consumers' ability to recover.

Indeed, so intent are Defendants on imposing these hurdles on consumers, that they also included a provision that voids the arbitration clause in its entirety when it is invalidated to any extent. (7/8/23 Terms § 20.11, Ex. A.) This provision only underscores that the arbitration clause

is designed not to facilitate efficient claims resolution, but rather the opposite: to impose one-sided burdens and costs that make resolution of such claims nearly impossible.

**Informal Dispute Resolution.** Defendants first require that Plaintiffs engage in an "informal dispute resolution" process that "is a condition precedent and requirement that must be fulfilled before commencing arbitration." (*Id.* § 20.2.) The clause requires consumers to personally participate in the dispute resolution conference, but contains no such requirement that an officer or employee from the Defendants participate in such conferences. (*Id.*) Accordingly, "[t]he provision … lacks mutuality, which is a 'paramount' consideration in assessing substantive unconscionability." *MacClelland*, 609 F. Supp. 3d at 1042.

The arbitration clause also contains measures designed to ensure that this dispute resolution process functions as a bottleneck to resolution of the claims. For example, the clause provides that "[t]he Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases …." (7/8/23 Terms § 20.2, Ex. A.) As a result, Defendants seek to compel thousands of individual conferences before arbitration can proceed. Such provisions "can operate to effectively thwart arbitration and vindication of rights altogether." *MacClelland*, 609 F. Supp. 3d at 1046.

**Arbitration Demand.** Plaintiffs next seek to impose several requirements for the arbitration demand, which apply only to consumers. These include requiring a statement of the legal claims being asserted and the factual bases for them, a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy, a statement certifying completion of the Informal Dispute Resolution process, and evidence that the claimant paid any necessary filing fees in connection with such arbitration. (7/8/23 Terms § 20.5, Ex. A.)

**"Batch" Arbitration.** Most significantly, the clause requires a procedure it labels "batch arbitration" that is not mentioned in the AAA rules, but which requires that claims be arbitrated "in batches of 100" "as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award." (*Id.* § 20.9.)[21] While the procedures governing "batch arbitration" are far from clear, it clearly disadvantages consumers.

*First*, batch arbitration deprives consumers of the right to have arbitration occur in the county where they reside. While "arbitration will be conducted in the county where you [the claimant] reside" when there are less than 100 claims, when "batch" arbitration is triggered, the arbitration occurs in another location determined by procedures that are not clear. (*Id.* § 20.5.)

*Second*, lumping each consumer's claim with 99 other claims deprives consumers of the "individual" adjudication that the arbitration clause purports to guarantee.

*Third*, grouping claims in batches is likely to be arbitrary and lead to further unfairness. For example, the court in *Heckman* found it troubling that a neutral would have "'sole discretion' in determining … whether to group together similar cases in a mass arbitration." "Such unfettered discretion invites the potential for unfairness … ." 686 F. Supp. 3d at 961.

*Fourth*, the clause requires that arbitrators "be selected by the parties from the AAA roster of consumer dispute arbitrators." (7/8/23 Terms § 20.6, Ex. A.) However, here, where there are millions of potential claims this limitation presents another barrier to resolution. [22]

*Finally*, the court in *Heckman* noted that such arbitration procedures raise significant due

[21] The post-litigation Terms trigger batch arbitration when there are only 25 demands and state: "Arbitration awards in one batch of arbitration demands shall have no precedential effect on subsequently administered batches." 2/1/24 Terms § 19.9, Ex. B to Def. Mot.

[22] Defendants appear to recognize this problem because later versions of the Terms state: "If the AAA is not available to arbitrate, the parties will select an alternative arbitral forum," which raises new problems and renders the clause vague and uncertain. Ex. B to Def. Mot. § 20.5.

process concerns "given the lack of other critical procedural safeguards present in MDLs and class actions." 686 F. Supp. 3d at 962. Claimants do not have the opportunity to participate in "batch" arbitrations other than their own arbitrarily-assigned batch. Moreover, "[t]here is no process for appointing leadership or impartial[ly] making determinations as to adequacy of counsel." *Id.* "And critically, there is no opportunity for claimants to opt out, as is required for class actions maintained under Fed. R. Civ. P. 23(b)(3)." *Id.* Accordingly, the court found that the "protocol creates a process that poses a serious risk of being fundamentally unfair to claimants, and therefore evinces elements of substantive unconscionability." *Id.*

**Sanctions.** The arbitration clause also rewrites Rule 11 in a way that is non-mutual, stating: "[t]he parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11 (b))." (7/8/23 Terms § 20.8, Ex. A.) The clause does not impose costs or fees for frivolous ***defenses***. Likewise, the clause purports to require that "the party that obtains an order compelling arbitration" shall "have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys fees incurred in securing an order compelling arbitration," but does not authorize such recovery if arbitration is denied—even where (as here) multiple courts have already held that the arbitration clause is unenforceable. (*Id.*)

**Public Injunctive Relief.** Finally, the arbitration clause is unconscionable because it does not allow for an award of public injunctive relief. *MacClelland*, 609 F. Supp. 3d at 1037. The Terms implicitly acknowledge this flaw, noting the possibility that a court may rule that the "limitations of this Section are invalid or unenforceable as to a particular claim or request for

relief (such as a request for public injunctive relief).” (7/8/23 Terms § 20.4, Ex. A.)

In sum, the arbitration clause contains “multiple substantively unconscionable provisions such that it indicates a systematic effort to impose arbitration not simply as an alternative to litigation, but as an inferior forum.” *See MacClelland*, 609 F. Supp. 3d at 1044.

## V. Discovery Would Further Demonstrate the Arbitration Clause’s Unenforceability.

Finally, while the arbitration clause (and Terms) are unenforceable on their face, discovery would undoubtedly produce further confirmation given that enforceability “is clearly a fact-intensive inquiry.” *Meyer*, 868 F.3d at 76. That is particularly true here, where Defendants adopted a novel “batch” arbitration provision and submitted factual material in support of their motion. *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 103 (2d Cir. 2022) (remanding for “evidence of how the [electronic] Agreement was presented”); *Heckman*, 2023 WL 5505999, at *2 (discovery ordered on “the validity, unconscionability, and severability” of arbitration clause).[23]

## CONCLUSION

For the foregoing reasons, Defendants’ motion to compel arbitration should be denied.

Dated: July 5, 2024

Respectfully submitted by,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Jeannie Evans*

[23] This dispute is not within the clause’s scope (Def. Mot. at 11) because the claims do not relate to “access to or use of the Services”—they relate to data theft. 7/8/23 Terms §20.12, Ex. A; *Jackson v. Amazon, Inc.*, 65 F.4th 1093, 1103 (9th Cir. 2023) (“wiretapping and invasion of privacy … does not touch on any matters related to the contract that would fall within the arbitration clause”). Indeed, *Ziboukh* includes Plaintiffs who never accessed or used Temu.

Jeannie Evans (Bar No. 6296339)
Hagens Berman Sobol Shapiro LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathaniel A. Tarnor, #4742797
68 3rd Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
nathant@hbsslaw.com

**ALPHEUS LLC**

Douglas G. Smith
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2024, a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

*/s/ Jeannie Y. Evans* ____________