UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ERIC HU, YO-YO CHEN, HECTOR ANDREW
CORDERO, EDWIN ANTONIO SURIS, MING
HUI LIN, CHRISTOPH B. OH, TRACY EVETTE
STARLING, NANCY BATALAS, TIMOTHY
SMITH, MANISHA REDDY NARAYAN,
DANIEL DAVID KATTAN, ROY NORMAN
MORROW, and JAMES LAFATA, *on behalf of
themselves and others similarly situated*,

**MEMORANDUM & ORDER**
23-CV-6962 (MKB)

Plaintiffs,

v.

WHALECO, INC., *doing business as* TEMU,

Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Eric Hu, Yo-Yo Chen, Hector Andrew Cordero, Edwin Antonio Suris, Ming Hui

Lin, Christoph B. Oh, Tracy Evette Starling, Nancy Batalas, Timothy Smith, Manisha Reddy

Narayan, Daniel David Kattan, Roy Norman Morrow, and James Lafata, commenced the above-

captioned proposed class action on September 20, 2023, and filed an amended complaint on

February 19, 2024, against Defendant Whaleco, Inc., doing business as Temu.  (Compl., Docket

Entry No. 1; Am. Compl., Docket Entry No. 19.)  Plaintiffs allege that Defendant violated the

federal Computer Fraud and Abuse Act, 18 U.S.C. § 103, and Electronic Communications

Privacy Act of 1986, 18 U.S.C. § 2510, and various state laws.[1]  (*See* Am. Compl.)  In addition,

---

[1]  Plaintiffs allege that Defendant violated the California Comprehensive Data Access and
Fraud Act, Cal. Penal Code § 502; the California False Advertising Law, Cal. Bus. & Prof. Code
§ 17500; the California Unfair Competition Law, *id.* § 17200; the Connecticut Action for
Computer-Related Offenses, Conn. Gen. Stat. § 52-570b; the Georgia Fair Business Practices
Act, Ga. Code Ann. § 10-1-399(a); the Illinois Biometric Information Privacy Act, 740 Ill.
Comp. Stat. 14/1; the Massachusetts General Laws, Mass. Gen. Laws, ch. 214, § 1B; the

Plaintiffs allege against Defendant various common law tort claims, including negligence, breach of implied contract, unjust enrichment, and trespass to personal property/chattels; and constitutional and tort claims under California law. (*See id.*)

On June 21, 2024, Defendant moved to compel arbitration of Plaintiffs' claims, which Plaintiffs and Amici[2] opposed.[3] For the reasons set forth below, the Court grants Defendant's motion to compel arbitration.

---

Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99; the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1); the New Jersey Fair Business Practices Act, N.J. Stat. Ann. § 56:8–12; the New York Civil Rights Law, N.Y. Civ. Rights Law § 51; the New York General Business Law, N.Y. Gen. Bus. Law § 349; the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02; the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.638; the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5725; the Texas Deceptive Trade Practices & Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.50(a); the Texas Harmful Access by Computer Act, Tex. Penal Code Ann. § 33; the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020; the Washington Disposal of Personal Information Act, Wash. Rev. Code § 19.215.020; and the Washington Notice of Security Breaches Act, Wash. Rev. Code § 19.255.010. (*See* Am. Compl.) In addition, Plaintiffs allege that Defendant violated the data breach statutes of various states and territories, including: California, Cal. Civ. Code §§ 1798.80–84; Hawaii, Haw. Rev. Stat. § 487N-1–4; Illinois, 815 Ill. Comp. Stat. Ann. 530/1–30; Louisiana, La. Stat. Ann. § 51:3071–3077, La. Admin. Code 16, pt. III, § 701; Michigan, Mich. Comp. Laws Ann. §§ 445.63, 445.65, 445.72; New Hampshire, N.H. Rev. Stat. Ann. §§ 359-C:19–C:21, 358-A:4, 332-I-1–I:610; New Jersey, N.J. Stat. Ann. § 56.8-163–166; North Carolina, N.C. Gen. Stat. § 75-65; Oregon, Or. Rev. Stat. §§ 646A.602, 646A.604, 646A.624; Puerto Rico, P.R. Laws Ann. tit. 10, §§ 4051, 4052; South Carolina, S.C. Code Ann. §§ 1-11-490, 39-1-90; Virgin Islands, V.I. Code Ann. tit. 14, § 2208; Virginia, Va. Code Ann. §§ 18.2-186.6, 32.1-127.1:05; and the District of Columbia, D.C. Code § 28-3851–3853. (*Id.* ¶¶ 368–379.) Plaintiffs also allege that Defendant violated the statutory consumer protection laws of each of the fifty states and the District of Columbia. (*Id.* ¶¶ 228–248.)

[2] On May 22, 2024, nonparty plaintiffs from *Ziboukh v. Whaleco, Inc.*, No. 24-CV-3733 (E.D.N.Y.) ("*Ziboukh* Plaintiffs" or "Amici"), moved to intervene. (*Ziboukh* Pls.' Notice of Mot. to Intervene or, in the Alternative, to Participate as Amicus Curiae, Docket Entry No. 26.) On May 29, 2024, the Court denied *Ziboukh* Plaintiffs' motion to intervene, but granted their motion to participate as Amici. (Order dated May 29, 2024.)

[3] (Def.'s Mot. to Compel Arbitration ("Def.'s Mot."), Docket Entry No. 36; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), Docket Entry No. 37; Pls.' Opp'n to Def.'s Mot. ("Pls.' Opp'n"), Docket Entry No. 39; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), Docket

## I.  Background

### a.  The parties

Plaintiffs are individuals located in various states including California, Connecticut, Florida, Georgia, Illinois, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Texas, and Washington,[4] who downloaded, registered an account with, and/or purchased products on Temu, a mobile application and online shopping platform in the United States that allows users to purchase low-cost goods manufactured in China (the "Temu App").[5]  (Am. Compl. ¶¶ 1, 23–35, 38–40, 174.)

Defendant, a Delaware corporation with its principal place of business in Massachusetts, operates the Temu App.  (*Id.* ¶¶ 36, 41.)

---

Entry No. 40; *Ziboukh* Pls.' Amicus Br. ("Amicus Br."), Docket Entry No. 45; Def.'s Reply to Amicus Br. ("Def.'s Amicus Reply"), Docket Entry No. 50; *Ziboukh* Pls.' Suppl. Amicus Br. ("Suppl. Amicus Br."), Docket Entry No. 51-1; Def.'s Reply to Suppl. Amicus Br. ("Def.'s Suppl. Amicus Reply"), Docket Entry No. 52-1.)

[4]  The Court assumes the truth of the factual allegations in the Amended Complaint and the motion papers filed by the parties as part of Defendant's motion to compel arbitration for the purpose of deciding Defendant's motion.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (noting that when resolving a motion to compel arbitration, a "court consider[s] all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002))); *McPherson v. Bloomingdale's, LLC*, No. 23-CV-1084 (E.D.N.Y. Dec. 8, 2023) ("Courts routinely consider documents outside the pleadings when evaluating motions to compel arbitration . . . ." (quoting *Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 366 (S.D.N.Y. 2022))).

[5]  Plaintiffs propose various nationwide and state-specific proposed class actions.  (*See* Am. Compl. ¶¶ 174–179.)  For example, for their federal claims, Plaintiffs propose the following class definition: "All persons residing in the United States who registered an account with Temu from July 2022 to the present day (the 'National Class')," excluding Defendant and "its affiliates, parents, subsidiaries, employees, officers, agents, and directors," as well as "any judicial officers presiding over this matter and the members of their immediate families and judicial staff."  (*Id.* ¶¶ 174–175.)

**b.    The Temu App's registration screen**

An individual must register for and create a Temu account to use the Temu App.  (*See* Pls.' Opp'n 1 ("[T]he Temu App requires a user to register an account by displaying a registration prompt that the user must respond to before they can proceed." (alteration in original) (quoting Decl. of Michael Trinh in Supp. of Def.'s Mot. ("Trinh Decl."), Docket Entry No. 38)); *see also* Am. Compl. ¶¶ 76, 174.)  As part of the registration process, users were shown the screen depicted below (the "Registration Screen").



(Registration Screen, annexed to Trinh Decl. as Ex. A, Docket Entry No. 38-1.)  Among other attributes, the Registration Screen has a white background, displays a text box that prompts a user to enter their email or phone number, and features prominently a large, orange "Continue" button.  (*Id.*)  At the bottom of the screen, underneath various text boxes allowing a user to sign in with

4

pre-existing accounts on various platforms and social media networks, the following sentence is displayed: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (*Id.*) The phrases "**Terms of Use**" and "**Privacy & Cookie Policy**," appear bold and hyperlinked in a dark gray font, while the remainder of the sentence appears in a light gray font. (*Id.*)

### c.    The terms of use

The terms of use (the "Terms"), hyperlinked on the Registration Screen, set forth policies and procedures governing the relationship between Temu App users and Defendant.[6] (*See* Terms.)  On the second page of the Terms, section 1.6 states in relevant part:

> PLEASE BE AWARE THAT SECTION 20 BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND TEMU WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE TERMS.  SECTION 20 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND TEMU BE RESOLVED BY BINDING AND FINAL ARBITRATION.  UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND TEMU WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS

---

[6] The parties provide different versions of Defendant's Terms. (*See* Temu's Terms of Use last updated July 8, 2023, annexed to Decl. of Jeannie Y. Evans as Ex. A, Docket Entry No. 46-1; Temu's Terms of Use last updated Dec. 29, 2023, annexed to Def.'s Mot. for a Pre-Mot. Conf. as Ex. B, Docket Entry No. 20-2; Temu's Terms of Use last updated Feb. 1, 2024, annexed to Trinh Decl. as Ex. B, Docket Entry No. 38-2.)  Although the changes between the versions appear to be only minor, unrelated changes that do not affect the Court's analysis, including the removal of a section titled "Services and Role of Sellers," the section numbering of the relevant sections regarding arbitration differ.  Accordingly, the Court cites the earliest Terms provided by the parties, namely the July 8, 2023 Terms.

AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

(*Id.* § 1.6; *see also id.* § 20.)  Section 20.1 specifies that the parties:

> agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of [Temu's applications, products, services, and websites ("Services")], any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except [for claims brought and adjudicated in small claims court and claims involving intellectual property rights].

(*Id.* § 20.1.)  However, before "either party commences arbitration against the other," the parties "will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ('Informal Dispute Resolution Conference')."  (*Id.* § 20.2.)  "The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ('Notice')[.]"  (*Id.*)  "Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration," and any "statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process."  (*Id.*)

If the Informal Dispute Resolution Conference process "does not resolve satisfactorily within sixty (60) days after receipt of Notice, [the parties] agree that either party shall have the right to finally resolve the Dispute through binding arbitration."  (*Id.* § 20.5.)  "The arbitration will be conducted by [the] American Arbitration Association, (the 'AAA')," (*id.*), and the arbitrator "will be either a retired judge or an attorney licensed to practice law in the State of New York" and "will be selected by the parties from the AAA roster of consumer dispute arbitrators," (*id.* § 20.6).  Section 20.7 of the Terms specifies that "[t]he arbitrator shall have

exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement," expect for limited exceptions, including disputes arising out of or relating to Section 20.4's class action waiver, disputes regarding the payment of arbitration fees, disputes about the satisfaction of any condition precedent to arbitration, and disputes about which version of the arbitration agreement applies.  (*Id.* § 20.7.)

The Terms also contain a "batch arbitration" clause, which provides that:

> [I]n the event that there are one hundred (100) or more individual [r]equests of a substantially similar nature filed against Temu by or with the assistance of the same law firm, group of law firms, or organizations, . . . [the] AAA shall (1) administer the arbitration demands in batches of 100 [r]equests per batch (plus, to the extent there are less than 100 [r]equests left over after the batching described above, a final batch consisting of the remaining [r]equests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration").

(*Id.* § 20.9.)  If the batch arbitration clause is found to be invalid or unenforceable under the law to any extent, then, pursuant to Section 20.11, the entire Arbitration Agreement would have no "force and effect."  (*See* Terms § 20.11 ("Except as provided in Section 20.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect.").)

## II.  Discussion

### a.  Standard of review

The Federal Arbitration Act (the "FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate.  *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Arbitration is a matter of contract and consent," and the Supreme Court has "long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes."  *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1191 (2024).  Thus, "[a]rbitration is 'a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.'  Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?"  *Id.* at 1192 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)); *see also Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) ("Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015))); *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012))).

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833–34 (2d Cir. 2021) (first quoting *Nicosia*, 834 F.3d at 229; and then quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)).  "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made."  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95,

8

101–02 (2d Cir. 2022).  "This burden does not require the moving party to show that the agreement would be enforceable — only that an agreement to arbitrate existed."  *Id.* at 102.  If the existence of an agreement to arbitrate is established, the burden shifts to the party "seeking to avoid arbitration . . . [to show] the agreement to be inapplicable or invalid."  *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)); *see also Zachman*, 49 F.4th at 102 (quoting *Harrington*, 602 F.3d at 124).  In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'"  *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, . . . the FAA compels the court to stay the proceeding."); *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

### b.   Defendant is not barred from compelling arbitration

Amici argue that Defendant is barred from compelling arbitration because "(1) the arbitration clause itself states it is void in the event the batch arbitration provision is deemed invalid or unenforceable and (2) even if there were no such language in the arbitration clause, prior decisions collaterally estop Defendant[] from invoking the clause."  (Suppl. Amicus Br. 7–9.)

Defendant argues that it is not barred from compelling arbitration because (1) no other federal court invalidated the specific batch arbitration clause that would trigger the severability provision in the Terms, and (2) it would be unfair to apply collateral estoppel against Defendant because at least one other court has agreed with Defendant's arguments and compelled arbitration.  (Def.'s Amicus Reply 7–8 & n.4.)

9

### i.    The arbitration agreement is not void under the plain language of the Terms

Amici argue that Defendant cannot compel arbitration under the Terms because the "Terms provide that, in the event Term's 'batch arbitration' provision is ruled invalid or unenforceable, the entire arbitration clause shall be void." (Suppl. Amicus Br. 7; *see also* Amicus Br. 15.)  In support, Amici argue that "two courts have ruled the batch arbitration provision (and the rest of the Terms) — are unenforceable" and therefore "under the Terms' plain language, the arbitration agreement has 'no force and effect.'"[7] (Amicus Br. 15.)  In addition, Amici contend that Defendant's argument that the arbitration agreement is not void under section 20.4 because these courts "invalidated the *whole* arbitration clause, not just the batch arbitration provision" fails because "the batch arbitration provision is part of the arbitration clause that was ruled invalid and thus was ruled invalid itself." (Suppl. Amicus Br. 8.)  Finally, Amici argue that the language of *Smith* and *Eakins* contradict Defendant's argument that those courts did not address any issue of validity but rather "whether an agreement to arbitrate had been *formed*" because these decision "expressly held that 'the parties did not enter into a *valid and binding* arbitration agreement.'" (*Id.* (first quoting Def.'s Amicus Reply 8 n.4; and then quoting *Smith v. Whaleco, Inc.*, No. 23-CV-559, 2024 WL 3513800, at *5 (W.D. Okla. July 23, 2024)).)

Defendant argues that Amici's argument that the decisions in other courts "make the entire arbitration agreement unenforceable by contract" is meritless. (Def.'s Amicus Reply 8 n.4.)  Although Defendant agrees that the Terms contain a severability provision, "which provides that

---

[7] *Johnson v. Whaleco, Inc.*, No. 23-CV-403, 2023 U.S. Dist. LEXIS 184104, at *10 (M.D. Fla. Oct. 13, 2023) (denying Temu's motion to compel arbitration); *see also Eakins v. Whaleco Inc.*, --- F. Supp. 3d ---, 2024 WL 1190766 (W.D. Okla. Mar. 5, 2024) (same).  After filing their opposition, Amici submitted a third federal district court case, *Smith v. Whaleco Inc.*, No. 23-CV-559, 2024 WL 3513800 (W.D. Okla. July 23, 2024), which similarly denied Temu's motion to compel arbitration as *Eakins* and *Johnson*.  (Notice of Suppl. Auth. in Supp. of Amicus Br., Docket Entry No. 49.) *Eakins* and *Smith* are currently on appeal before the Tenth Circuit Court of Appeals.

if the *batching provision* of the arbitration agreement is found *invalid* or *unenforceable*, both parties agree that the entire arbitration agreement is null and void," it argues that the other "decisions did not address the Terms' batching provision at all, let alone find it invalid or unenforceable." (*Id.*)  In addition, Defendant argues that "the decisions did not address *any* issue of validity or enforceability whatsoever; instead, the issue was whether an agreement to arbitrate had been *formed*, not whether any aspect of it was valid or enforceable." (*Id.*)  Defendant further argues that these courts could not "rule that the batching provision is unenforceable, as that issue is delegated exclusively to the arbitrator under Section [20.7] of the Terms." (*Id.*)

The Court finds that the other federal court decisions cited by Amici — *Johnson*, *Eakins*, and *Smith* — did not find that the batch arbitration clause was "invalid" or unenforceable" but rather that no valid agreement was formed between Temu App users and Defendant because the users did not have inquiry notice of the Terms.  *See Smith*, 2024 WL 3513800, at *1 ("Under substantially similar facts, [the *Eakins* court] found that no valid agreement was formed.  Upon consideration, the [c]ourt . . . reaches the same conclusion in this case."); *Eakins v. Whaleco, Inc.*, --- F. Supp. 3d ---, ---, 2024 WL 1190766, at *3–4 (W.D. Okla. Mar. 5, 2024) (concluding that "the App failed to provide reasonably conspicuous notice that [the p]laintiff was agreeing to [Temu]'s terms of use when creating her account" and, therefore, "that the parties did not enter into a valid arbitration agreement"); *Johnson v. WhaleCo., Inc.*, No. 23-CV-403, 2023 U.S. Dist. LEXIS 184104, at *9–10 (M.D. Fla. Oct. 13, 2023) ("Plaintiff was not put on notice to the [arbitration a]greement with [Temu] and cannot be compelled to arbitrate this dispute.").  In fact, none of these courts reproduced or analyzed the Terms' provisions, generally, or the batch arbitration clause, specifically.  The Court therefore finds that neither *Johnson*, nor *Eakins*, nor *Smith* triggered Section 20.11's invalidity clause.  Accordingly, the arbitration agreement is not void under the plain language of the Terms, and Defendant may seek to compel arbitration.

### ii. Collateral estoppel does not bar Defendant from compelling arbitration

Amici argue that Defendant is collaterally estopped from moving to compel arbitration pursuant to the Terms because three district courts have already denied Defendant's motion to compel arbitration on essentially the same facts and law, and one of the district court decisions has been reduced to a final judgment. (Amicus Br. 15–16; Suppl. Amicus Br. 8–9.) In support, Amici contend that Defendant's argument that it would be unfair to apply collateral estoppel fails because "the 'unfairness' analysis depends on multiple factors, many of which demonstrate there is no 'unfairness' here," including that Defendant "had full 'incentive to raise [the issue] in the earlier action' and in fact did so, seeking to arbitrate in each of the [prior] cases," (Suppl. Amicus Br. 8–9 (first alteration in original)), and "there were no 'procedural opportunities unavailable in the [prior] action[s] that could readily cause a different result' here," (*id.* at 9 (alterations in original) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979))). In addition, Amici argue that the inconsistent state court decision that Defendant cites has unique factual issues, including that (1) the plaintiff was a "repeat litigant who 'had already filed "eleven class action lawsuits," and the "reasonable inference [was] that . . . [she] should have been aware that online retailers have 'Terms of Use' or 'Terms and Conditions' agreements," (*id.* (quoting *Eakins*, 2024 WL 1190766, at *4)); (2) the plaintiff "never specifically argue[d] that she did not have *actual knowledge* of [Temu]'s Terms of Use," (*id.* (first alteration in original) (quoting *Fontanez v. Whaleco, Inc.*, No. 53-3032CA-374 (Fla. Polk Cnty. Ct. Nov. 15, 2023))); and (3) "the *Fontanez* court applied Florida law," (*id.*).

Defendant argues that none of the out-of-circuit district court decisions "have preclusive effect on this Court" because they are "inconsistent with Second Circuit law, and they are also inconsistent with the opinion of another court in Florida that held that [the Registration Screen]

was sufficiently conspicuous." (Def.'s Amicus Reply 7–8.)  In support, Defendant argues that the *Fontanez* court granted Defendant's motion to compel arbitration, *see Fontanez*, No. 53-3032CA-374, at 5, and therefore offensive collateral estoppel cannot be applied because "the judgment [Amici] rel[y] upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the [D]efendant," (Def.'s Amicus Reply 8 (quoting *Parklane Hosiery*, 439 U.S. at 330); *see also* Def.'s Suppl. Amicus Reply 3–4).

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding[.]" *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 371 (2d Cir. 2023) (quoting *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 284 (2d Cir. 2012)); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002) (same); *see also Whitfield v. City of New York*, 96 F.4th 504, 523 n.16 (2d Cir. 2024) ("Issue preclusion 'precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment.'" (quoting *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 411 (2020))); *Scuderi-Hunter v. Merklen*, No. 23-542, 2024 WL 1005793, at *2 (2d Cir. Mar. 8, 2024) ("Issue preclusion, also referred to as collateral estoppel, bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment.'" (alteration in original) (quoting *Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021))); *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) ("Issue preclusion, or collateral estoppel, . . . applies not to claims or to causes of action as a whole but rather to issues . . . ."). Under federal law, which governs the preclusive effect of a prior federal judgment, *see Marvel Characters*, 310 F.3d at 286, the following criteria must be satisfied to bar relitigation of an issue:

> (1) the issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been actually litigated and actually decided; (3) there must have been a full and fair opportunity for

13

litigation in the prior proceeding; and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Clark v. Hanley*, 89 F.4th 78, 100 n.28 (2d Cir. 2023) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999)); *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019) (quoting *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005)); *United States v. Dominguez*, 712 F. App'x 100, 102 (2d Cir. 2018) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)).

An issue is a "single, certain and material point[] arising out of the allegations and contentions of the parties." *Bifolck*, 936 F.3d at 81 (quoting *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014)). As the Second Circuit has observed, an issue:

> may concern only the existence or non-existence of certain facts, or it may concern the legal significance of those facts. If the issues are merely factual, they need only deal with the same past events to be considered identical. However, if they concern the legal significance of those facts, the legal standards to be applied must also be identical; different legal standards as applied to the same set of facts create different issues.

*Matusick*, 757 F.3d at 48 (alteration omitted) (quoting *Overseas Motors, Inc. v. Imp. Motors Ltd.*, 375 F. Supp. 499, 518 n.66a (D. Mich.), *aff'd*, 519 F.2d 119 (6th Cir. 1974)); *see also Bifolck*, 936 F.3d at 81 (quoting *Matusick*, 757 F.3d at 48); *Faulkner*, 409 F.3d at 37 ("Use of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" (quoting *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 599–600 (1948))).

For an issue to be "actually litigated and actually decided," the issue must be "properly raised by the pleadings or otherwise," and, in addition, it must be "submitted for determination,

14

and . . . determined . . . ." *Ranasinghe v. Kennell*, 718 F. App'x 82, 84 (2d Cir. 2018) (quoting *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 573 (1986)).

In examining whether a litigant has had a full and fair opportunity to litigate an issue, courts look to whether the litigant "was fully able to raise the same factual or legal issues" asserted in the current action. *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002); *see also Yan Yam Koo v. Dep't of Bldgs.*, 218 F. App'x 97, 99 (2d Cir. 2007) (quoting *LaFleur*, 300 F.3d at 274).

In order for a decision to constitute a "valid and final judgment on the merits," "collateral estoppel, unlike appealability under 28 U.S.C. § 1291 (1988), does not require a judgment which ends the litigation and leaves nothing for the court to do but execute the judgment." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992), *abrogated on other grounds as recognized in Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010). "[T]he concept of finality for collateral estoppel purposes includes many dispositions which, though not final in that sense, have nevertheless been fully litigated." *Id.* "Whether a judgment, not 'final' in the sense of 28 U.S.C. § 1291, ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue," requires a review of "the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961); *see also Kay-R Elec. Corp. v. Stone & Webster Const. Co.*, 23 F.3d 55, 59 (2d Cir. 1994) (quoting *Lummus*, 297 F.2d at 89). The meaning of "final" for purposes of collateral estoppel "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus*, 297 F.2d at 89.

"The party asserting collateral estoppel bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding."

15

*Abdelal v. Kelly*, 762 F. App'x 8, 11 (2d Cir. 2018) (quoting *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)); *see also Gonzalez v. City of New York*, 845 App'x 11, 16 (2d Cir. 2021) (quoting *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 728 (2d Cir. 2001)); *Brandon v. NPG Recs.*, 840 F. App'x 605, 608 (2d Cir. 2020) ("[The plaintiff], as the party seeking to prevent the application of collateral estoppel here, has the burden of showing that he did not have a full and fair opportunity to litigate [the issue] before the [other federal] court.").

"Nonmutual offensive collateral estoppel, a form of issue preclusion, 'preclude[s] a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff.'" *Bifolck*, 936 F.3d at 79 (quoting *Faulkner*, 409 F.3d at 37); *see also Parklane Hosiery*, 439 U.S. at 326 n.4 ("[O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party."). "[T]o blunt the fear that nonmutual offensive collateral estoppel may be unfair to a defendant or fail to promote judicial economy, district courts must ensure that application of the doctrine is not unfair." *Bifolck*, 936 F.3d at 80, 84 ("Even if a court concludes that all four prongs of the nonmutual offensive collateral estoppel analysis have been established, it must still assure itself that it is fair to apply the doctrine."); *see also Parklane Hosiery*, 439 U.S. at 331 ("[W]here . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow [it]."); *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 600 n.2 (2d Cir. 2021) (noting that nonmutual offensive collateral estoppel "cannot be applied if it would be unfair to the defendant"). "Unfairness arises 'if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.'" *Homaidan*, 3 F.4th at 600 n.2 (quoting *Parklane Hosiery*, 439 U.S. at 330); *Bifolck*, 936 F.3d at 84 (noting several factors that courts have considered when

16

reviewing for fairness, including whether "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant" and whether "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result" (quoting *Parklane Hosiery*, 439 U.S. at 330–31)).  A "district court is generally accorded wide discretion to determine when offensive collateral estoppel should be applied."  *Bifolck*, 936 F.3d at 80 (quoting *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995)); *see also Parklane Hosiery*, 439 U.S. at 331 (noting that district courts retain "broad discretion" to determine whether offensive collateral estoppel should be applied to preclude relitigation of an issue)

The Court finds that, even if the four prongs of the nonmutual offensive collateral estoppel analysis were satisfied, applying the doctrine to bar Defendant from attempting to enforce the Terms and compel arbitration would be unfair because at least one other court has granted Defendant's motion to compel based on the Terms at issue in this action.  *Compare Fontanez*, No. 53-3032CA-374, at 5 (granting Temu's motion to compel arbitration), *with Johnson*, 2023 U.S. Dist. LEXIS 184104, at *10 (denying Temu's motion to compel arbitration); *see also Homaidan*, 3 F.4th at 600 n.2 (declining to preclude the defendant from advancing its interpretation of a statutory provision it already raised before and was rejected by other courts because "the Fifth and Tenth Circuit cases relied upon by [the plaintiff] are inconsistent with earlier cases that adopted [the defendant]'s broader reading of" the statute provision); *Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 426–27 (S.D.N.Y. 2019) (declining to apply collateral estoppel on fairness grounds when (1) "the judgments in [two Colorado district court decisions and a Tenth Circuit decision were] in conflict with the judgment of the District of Illinois," and (2) "the court in [one Colorado district court decision] was bound by the precedent of the Tenth Circuit . . . , while this [c]ourt [was] not"), *aff'd*, 21 F.4th 207 (2d Cir. 2021); *Flood*

*v. Just Energy Mktg. Corp.*, 904 F.3d 219, 237 (2d Cir. 2018) (affirming denial of collateral estoppel when the defendant had previously prevailed in another district court).  Because the *Johnson* decision is inconsistent with the *Fontanez* decision,[8] the Court declines to apply nonmutual offensive collateral estoppel.

### c.    A valid agreement to arbitrate exists

Defendant argues that Plaintiffs validly agreed to the Terms, including the arbitration agreement, because they "had sufficient notice of the Terms, and manifested their assent to be bound by them, when they created their Temu accounts."  (Def.'s Mem. 6–10; *see also* Def.'s Reply 3–8.)

Plaintiffs argue that they "were not provided adequate notice of the proffered agreement to arbitrate" and point to other federal district courts that reviewed Defendant's "exact registration prompt" and concluded that Defendant's Registration Screen did not provide users sufficient notice of its Terms.  (Pls.' Opp'n 5–8.)  Amici similarly argue that Defendants failed to provide Plaintiffs adequate notice of the Terms, relying on the same federal district court cases as Plaintiff.  (Amicus Br. 4–15.)

"[D]espite the strong federal policy favoring arbitration, arbitration remains a creature of contract," and courts must therefore "decide whether the parties to a contract have agreed to arbitrate disputes."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019) ("[A]rbitration is a matter of

---

[8]  The facts in *Fontanez* do not sufficiently distinguish it from *Johnson* because the *Fontanez* court specifically ruled on the issue of inquiry notice and manifestation of assent, and the *Johnson* court, on which Amici rely, also applied Florida law.  *See Johnson*, 2023 U.S. Dist. LEXIS 184104, at *10 (relying on Florida and Eleventh Circuit law); *Fontanez*, No. 53-3032CA-374, at 5 (holding that Temu's "full-screen user interface design with the 'Continue' button just above the bolded hyperlink to the Terms of Use is conspicuous enough to put a reasonably prudent person on inquiry notice" and that "by clicking 'Continue,' [the plaintiff] assented to the Terms of Use that contained an arbitration clause").

contract, and courts must enforce arbitration contracts according to their terms." (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010))); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023) ("It is well-established that the [FAA] provisions reflect both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" (quoting *AT&T Mobility*, 563 U.S. at 339)); *Holick*, 802 F.3d at 395 ("[A] party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit." (quoting *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004))). "[W]hile the [FAA] 'place[s] arbitration agreements on an equal footing with other contracts,' it 'is not a substitute for contractual assent, and [courts] will not enforce arbitration unless and until it is determined that an agreement [to arbitrate] exists.'" *Edmundson*, 85 F.4th at 702 (third and fifth alterations in original) (first quoting *AT&T Mobility*, 563 U.S. at 339; and then quoting *Soliman*, 999 F.3d at 834).

"Whether the parties have agreed to arbitrate is generally a question of state contract law," although "traditional contract formation law does not vary meaningfully from state to state." *Id.* at 702–03; *Meyer*, 868 F.3d at 74 ("State law principles of contract formation govern the arbitrability question." (quoting *Nicosia*, 834 F.3d at 231)). "To create a binding contract under New York law, the parties must provide a 'manifestation of mutual assent sufficiently definite to assure that they are truly in agreement with respect to all material terms.'" *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 199 (2d Cir. 2019) (alteration adopted) (quoting *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016)); *see also Starke*, 913 F.3d at 288 ("It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'"). Although "[t]hese principles are the 'touchstone of contract' formation and they apply with equal force to contracts formed online," the Second Circuit has "recognized that an offeree's manifestation of assent to an offeror's terms looks

19

different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print." *Edmundson*, 85 F.4th at 703 (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)); *see also Meyer*, 868 F.3d at 75–76 (discussing how a user manifests assent to different types of web-based contracts, including "clickwrap," "browsewrap," and "sign-in-wrap" agreements).  Accordingly, a party may agree to arbitrate when they have actual notice of the terms of the arbitration agreement or when notice of the terms is conspicuous enough to put a reasonably prudent person on inquiry notice and the person unambiguously manifests assent.[9]  *See, e.g.*, *Edmundson*, 85 F.4th at 703; *Starke*, 913 F.3d at 289; *Meyer*, 868 F.3d at 74–75; *Schnabel*, 697 F.3d at 123.  When "there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a '"reasonably prudent" person would be on *inquiry* notice' of the terms, and (2) the user unambiguously manifests assent 'through . . . conduct that a reasonable person would understand to constitute assent." *Edmundson*, 85 F.4th at 703 (first quoting *Soliman*, 999 F.3d at 834; and then quoting *Schnabel*, 697 F.3d at 120).  "Both inquiries, therefore, are generally measured by an 'objective standard,' and are 'clearly . . . fact-intensive.'" *Id.* (first quoting *Specht*, 306 F.3d at 26; and then quoting *Meyer*, 868 F.3d at 76).

### i.    Reasonably conspicuous notice

Defendant first argues that "there are no rigid requirements as to exactly how a link to terms of service must be presented in order to be conspicuous" and although "some courts focus on whether the hyperlink is underlined, in a specific color, or of a certain font size, the weight of authority holds that no single factor is required or determinative." (Def.'s Mem. 8 (collecting

---

[9]  The parties do not argue that Plaintiffs had actual knowledge of the arbitration agreement. (*See* Def.'s Mem.; Pls.' Opp'n.)  Accordingly, the Court only addresses whether the Registration Screen provided sufficient inquiry notice to Plaintiffs that they would be bound by the Terms, including the arbitration agreement, and whether Plaintiffs unambiguously manifested assent.

cases).)  Second, Defendant argues that what is relevant in the Court's analysis "is the *overall design* of the [Registration Screen] . . . , not discrete aspects of it in isolation."  (Def.'s Reply 5 (collecting cases).)  Finally, Defendant argues that the Registration Screen satisfies the reasonable notice standard because it "is uncluttered and appears on a single screen, and the hyperlink to the Terms appears in bold font, adjacent to the buttons for creating an account — clearly visible to a reasonably prudent user," (Def.'s Amicus Reply 2–3; *see also* Def.'s Mem. 8), and courts "regularly hold that this format provides reasonable notice of the linked terms," (Def.'s Mem. 8–9 (collecting cases)).

Plaintiffs first argue that they were not provided adequate notice because the hyperlink itself was "not prominent or particularly remarkable at the bottom of the page where it [was] featured" as the hyperlink was "a very light grey front against a white background, devoid of underlined text or any conspicuous visual cues," and the font color, even if bolded, was such a light grey that "the words still appear[ed] significantly lighter than the conspicuous black and colorful text used elsewhere on the webpage[,] and d[id] not attract attention."  (Pls.' Opp'n 7–8 (third alteration in original) (quoting *Johnson*, 2023 U.S. Dist. LEXIS 184104, at *7–8 & n.7).)  Plaintiffs further argue that this choice of "camouflaged font . . . evince[d] an intent to *conceal* those hyperlinks from conspicuous view, which militates strongly against finding the existence of an agreement to arbitrate."  (*Id.* at 9 (quoting *Johnson*, 2023 U.S. Dist. LEXIS 184104, at *8).)  Second, Plaintiffs argue that the Registration Screen "was 'cluttered' with distracting elements, including not only the four or five 'Continue' buttons but also advertisements at the very top of the screen, . . . for '[f]ree shipping [o]n all orders' and '[f]ree returns [w]ithin 90 days,' meant to catch the user's attention and induce them to register an account with Temu."  (*Id.* (alterations in original); *see also id.* at 10 (quoting *Johnson* for its conclusion that the placement of "the faint text linking" to the Terms "at the bottom of the webpage beneath four [five on Apple devices]

21

buttons and far below the bright-orange 'Continue' button" did "not put a reasonably prudent user on inquiry notice").)

Amici argue that there are "many features of the Temu website that courts have ruled defeat the constructive notice necessary to render terms enforceable," including:

> (1) the hyperlink to the Terms (and statement regarding assent to the Terms) are not adjacent to the button manifesting assent, but rather at the bottom of the page, (2) the hyperlink to the Terms (and statement regarding assent) are in the smallest font on the page, (3) the hyperlink to the Terms is not distinguishable from the surrounding text (through bright blue coloring or underlining for example), and indeed appears to be purposefully designed to blend in with the surrounding text, (4) there are multiple buttons and statements in larger font appearing between the button manifesting assent and the hyperlink to the Terms (and statement regarding assent), (5) the button manifesting assent does not say "I agree," "Sign up," "Create Account," or "Register," but rather merely states "continue," and (6) in addition to the other buttons and statements on the page, there are unrelated statements promoting Temu as providing "free shipping" and "free returns".

(Amicus Br. 10–11.)  In addition, Amici argue that "the Temu website is highly cluttered," especially given the promotions on the Registration Screen and "the general gamified nature of the website," which "undermines any claim [that] consumers were provided adequate notice." (*Id.* at 13–14.)  Finally, Amici argue that the Registration Screen's "structure made the hyperlink even more obscure" because the "hyperlink was *not* in close proximity, much less 'adjacent', to the button manifesting consent" as "there were multiple brightly colored, large buttons separating the 'continue' button from the hyperlink."[10]  (Suppl. Amicus Br. 5–6.)

---

[10]  Although Amici argue that Defendant has "since modified the [Registration Screen] to partially address" alleged issues identified by Amici and that Defendant "would not have made these changes if the prior [screen] gave consumers 'clear and conspicuous' notice," (Suppl. Amicus Br. 6–7), the fact that Defendant subsequently made changes to its registration screen does not inform the Court whether the screen at issue in this case (*i.e.*, the screen Plaintiffs used to register their accounts with Defendant) put Plaintiffs on sufficient inquiry notice under the standards articulated by the Second Circuit.

As to the first requirement of inquiry notice — reasonably conspicuous notice — "[a] reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way."[11] *Edmundson*, 85 F.4th at 704. "In the context of web-based contracts, [a court] looks to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Id.* (quoting *Starke*, 913 F.3d at 289). The Second Circuit has identified numerous design characteristics that may inform this determination:

> • Whether the relevant screen is "uncluttered" with only a few items, such as fields for registration or payment information and the notice and hyperlinked terms, or is "cluttered" with extraneous information, unrelated hyperlinks, text displayed in various font sizes and colors, or multiple buttons and promotional advertisements;
>
> • Whether notice and hyperlinked terms are conspicuous in light of the whole web page, particularly given the capitalization, bolding, underlining, sizing, and font choice;
>
> • Whether the entire screen, including the notice and hyperlinked terms, is visible at once without need for a "user to scroll beyond what is immediately visible"; and
>
> • Whether the notice and hyperlinked terms are temporally and "spatially coupled with the mechanism for manifesting assent."

*See Edmundson*, 85 F.4th at 705–07; *Starke*, 913 F.3d at 290–92; *Meyer*, 868 F.3d at 78–82; *Nicosia*, 834 F.3d at 233–38. Based on these criteria, the interfaces used in *Meyer*, 868 F.3d at 79, and in *Edmundson*, 85 F.4th at 709, were sufficient as a matter of law to put a user on inquiry notice, while the email in *Starke*, 913 F.3d at 297, and the interface in *Nicosia*, 834 F.3d at 238, were not sufficient as a matter of law and required a determination by a fact finder. For ease of comparison, the screens the Second Circuit analyzed in each case are reproduced below.

---

[11] A "reasonably prudent" user is "not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023).



Interface in *Edmundson*



Interfaces in *Meyer*



Email in *Starke*



Interface in *Nicosia*

Defendant's Registration Screen is closer to Klarna's interface in *Edmundson* and Uber's interface in *Meyer* than SquareTrade's email in *Starke* and Amazon's interface in *Nicosia*. The Registration Screen appears relatively uncluttered, is visible at once, and the notice and bolded hyperlinks are spatially and temporally coupled with a user's creation of an account.

25

### 1.    The Registration Screen appears uncluttered

The Registration Screen appears "uncluttered" because it presents users with a single field to enter details, two links — one to the Terms and one to a privacy policy — and five buttons to select either to register for a new account or to connect to four types of pre-existing accounts.  *Compare Edmundson*, 85 F.4th at 705, 712 (finding the interface was "uncluttered" because "the only link provided [was] to [the defendant]'s terms, and the user [was] presented with only one button to click — that is, selecting 'Confirm and continue'"), *and Meyer*, 868 F.3d at 78, 82 (finding the interface was "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY'"), *with Starke*, 913 F.3d at 293 (noting that the terms hyperlink was "some of the smallest text in the email and [came] after several prompts unrelated to the enclosure of the contract, including a 'Need help?' hyperlink, a button for [the plaintiff] to log in to his . . . account, a hyperlink for [the plaintiff] to submit the receipt for his CD player, the chart with the details of the plan, and a banner urging [the plaintiff] to review the [p]rotection [p]lan" and concluding that the overall clutter of the interface was "[l]ike the interface in *Nicosia*, and in sharp contrast with the screen in *Meyer*"), *and Nicosia*, 834 F.3d at 237–38, 241 (holding that "reasonable minds could disagree on the reasonableness of notice" when the interface contained "between fifteen and twenty-five links," "various text . . . in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements," and "the customers' personal address, credit card information, shipping options, and purchase summary").

Plaintiffs' and Amici's argument that the Registration Screen is cluttered because it contains "unrelated promotions of 'free shipping' and 'free returns' that . . . obscure the

hyperlinked Terms" is not persuasive.  (Amicus Br. 13; *see also* Pls.' Opp'n 9; Suppl. Amicus Br. 6.)  The Second Circuit has not held that an "uncluttered" interface must be free of "promotions" or "extraneous information," (*see* Suppl. Amicus Br. 6; Amicus Br. 13), but rather has explained that an uncluttered interface "does not include a *plethora* of clutter or extraneous information," *Edmundson*, 85 F.4th at 706 (emphasis added); *see also Starke*, 913 F.3d at 293; *Nicosia*, 834 F.3d at 237–38, 241; *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 830 (S.D.N.Y. 2020) ("The sign-up box pops up in front of the Postmates home screen that is decorated with pictures of food, but the sign-up box itself has a white background with black and grey text that is clear and conspicuous.  This interface is similar to the sign-up box in *Meyer* . . . , which the Second Circuit found to provide conspicuous notice of hyperlinked terms of use given the uncluttered screen with fields for a user to enter his or her payment information.").  The Court finds that the "free shipping" and "free returns" promotions do not render the Registration Screen cluttered.

> ### 2.    The notice and hyperlink are reasonably conspicuous and visible at once

The notice and hyperlink are reasonably conspicuous and visible at once.  The hyperlink directing a user to the Terms is bolded and in a dark gray font, which contrasts against the light gray font of the remainder of the notice and the white background of the Registration Screen.  (Registration Screen.)  Although the "TEMU" page header is the largest font on the Registration Screen, the notice and hyperlink are in a font size comparable to other text, including the "continue" button options and the "Email or phone number" and "Trouble signing in?" text.  (*Id.*); *see Graham v. Bloomberg L.P.*, No. 22-CV-7015, 2023 WL 6037974, at *5 (S.D.N.Y. Sept. 15, 2023) ("Although [the hyperlinked] text is not written in a font as large as the page headers, it is in a font size comparable to numerous other text items on that screen such as billing and subscription information."); *Peni v. Daily Harvest, Inc.*, No. 22-CV-5443, 2022 WL 16849451, at

27

*4 (S.D.N.Y. Nov. 10, 2022) (finding that the gray text warning — "[b]y clicking above, you agree to our Terms of Use and Terms of Sale, and consent to our Privacy Policy" — was reasonably conspicuous because, *inter alia*, the "dark" text was "set off from the light background and [was] written in a font roughly the same size as that of the primary text on the page"); *Feld*, 442 F. Supp. 3d at 831 ("That the notice and hyperlinks are in a smaller font size does not render the disclaimer inconspicuous; the grey and black color contrast against the white background and are clear to the reasonably prudent user creating an account. The hyperlinks to the [Terms of Service] and Privacy Policy are in a darker, bolder font than the rest of the text, signifying to a reasonably prudent use that these would be clickable terms." (citations omitted)); *cf. Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) ("Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract. Beyond the coloring, there were no familiar indicia to inform consumers that there was in fact a hyperlink that should be clicked and that a contract should be reviewed, such as words to that effect, underlining, bolding, capitalization, italicization, or large font."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (finding that the defendants' terms of use were not made "readily and obviously available to [the consumer]" when the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold"). *But see Smith*, 2024 WL 3513800, at *3 ("Most glaring, however, is the [Temu] App's failure to distinguish the 'Terms of Use' hyperlink from its surrounding text." (quoting *Eakins*, 2024 WL 1190766, at *3)); *Johnson*, 2023 U.S. Dist. LEXIS 184104, at *7–8 ("Most damning to [Temu]'s attempt to enforce the Agreement is its use of a very light grey font against a white background, devoid of underlined text or any conspicuous visual cues.").

The Court finds unpersuasive Plaintiffs' and Amici's arguments that Defendant did not provide Plaintiffs with reasonably conspicuous notice because the hyperlink was not in large font, capitalized, underlined, or in a color that sharply contrasted with the Registration Screen's

28

background given that "there are infinite ways to design a website or smartphone application" and "there are no particular features that must be present to satisfy the reasonably conspicuous standard." *Edmundson*, 85 F.4th at 707 (first quoting *Meyer*, 868 F.3d at 75; and then quoting *Soliman*, 999 F.3d at 842); *Soliman*, 999 F.3d at 842 (refusing to "impose" a rigid list of "particular features that must be present to satisfy the reasonably conspicuous standard"); *Garcia v. Nabfly, Inc.*, No. 23-CV-1162, 2024 WL 1795395, at *7 (S.D.N.Y. Apr. 24, 2024) ("The issue of inquiry notice does not turn entirely on whether the text at issue is of a certain color or font . . . ."). The hyperlink to the Terms is bolded, in a dark gray font, and in a font size similar to surrounding text, and there are few conflicting colors on the Registration Screen, as the color scheme is essentially black, white, and gray, with a single orange bar indicating where a user should click to continue. (Registration Screen); *see Garcia*, 2024 WL 1795395, at *7 ("[T]he phrase 'See full terms here.' is in black text on a white background; is printed in the same font as neighboring text; it appears at the end of a short three-sentence paragraph; and it is located immediately above the check off box saying, 'I agree – Let's do this.'"); *Graham*, 2023 WL 6037974, at *5 ("There are few conflicting colors on [the interface], as the scheme is basically black, white, and grey, with a single purple bar indicating where to purchase."). In addition, the notice and hyperlink are "visible at once, and the user does not need to scroll beyond what is immediately visible." *Edmundson*, 85 F.4th at 705 (quoting *Meyer*, 868 F.3d at 78); *cf. Specht*, 306 F.3d at 23, 31–32 (holding that a reasonably prudent user would not have known of terms that were visible only if the user "happen[ed] to scroll down" to the bottom of the webpage).

### 3. The notice and hyperlinked terms are spatially and temporally coupled with the initial transaction

The notice and hyperlinks are spatially and temporally coupled with the user's initial transaction with the Temu App — creating an account. The text of the notice, with hyperlinks to

the Terms and privacy policy, appears directly below the five options to create an account and is provided simultaneously with registration. (Registration Screen (providing one option to create a new account and four options to use a pre-existing account to log in)); *Meyer*, 868 F.3d at 78 (finding that Uber's terms were spatially and temporally "coupled with the mechanism for manifesting assent — *i.e.*, the register button" when (1) the warning language with hyperlinks "appear[ed] directly below the button for registration," and (2) the notice of the terms was "provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply"); *Peni*, 2022 WL 16849451, at *4 ("The button is also temporally coupled with the terms because the terms are presented as a user is signing up for a[n] . . . account."); *Feld*, 442 F. Supp. 3d at 831 ("The notice and the sign-up options are also 'temporally coupled,' *i.e.*, the notice appears at the time of account creation, such that 'reasonably prudent . . . user would understand that the terms were connected to the creation of a user account.'" (quoting *Meyer*, 868 F.3d at 78)); *Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 161 (E.D.N.Y. 2019) (finding that the defendant's interface was similar to Uber's in *Meyer* when, *inter alia*, "[t]he request to agree to the user agreement and privacy policy appear[ed] . . . immediately above the 'Create Account' button and [was] 'provided simultaneously to enrollment'"); *cf. Starke*, 913 F.3d at 294 (finding that the hyperlink to the terms and conditions included in a post-sale email "was neither spatially nor temporally coupled with the transaction"). *But see Eakins*, 2024 WL 1190766, at *3 (finding that Temu's "terms of use agreement appear[] in relatively small font at the bottom of the screen — spatially decoupled from the attention-grabbing orange 'Continue' button that users click to create their account"); *see also Smith*, 2024 WL 3513800, at *4–5 (agreeing with the *Eakins* court that "a spatial separation, the eye-catching logos of other options in that space (Google, Facebook, Apple, and Twitter), and the small light grey font on a white screen with no indication of a hyperlink" of the "by continuing" statement on the registration

page was insufficient to "provide conspicuous notice to a consumer that they were agreeing to a contract that included the Terms" and concluding that the additional login screen displayed after a user clicked "Continue with Google" was similarly insufficient to provide notice because it did not "inform [the p]laintiff that proceeding to the App by allowing Google to share her information with [Temu] would signify an agreement to or acceptance of [Temu's] terms of service"). The Second Circuit has held that this spatial and temporal coupling indicates that "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *Meyer*, 868 F.3d at 78; *Schnabel*, 697 F.3d at 127 ("[T]he presentation of [non-negotiable contract] terms at a place and time that the consumer will associate with the initial purchase or enrollment . . . indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her.").

Moreover, the fact that the hyperlink was located at the bottom of the Registration Screen, below the "Continue" button and other buttons allowing a user to register through existing accounts, does not render it spatially decoupled. *See, e.g.*, *Meyer*, 868 F.3d at 81 (finding spatial coupling when the notice and hyperlink were located below the "Register" button and two buttons for third-party payment services); *Bolling v. Bob's Disc. Furniture, LLC*, No. 22-CV-6312, 2024 WL 1327357, at *2 (E.D.N.Y. Mar. 27, 2024) (finding that the plaintiff "had ample notice of the arbitration provision" because she "easily could have reviewed the full terms by clicking 'See Terms & Conditions,' displayed conspicuously at the bottom of the purchase page"); *cf. Graham*, 2023 WL 6037974, at *4 (finding that the notice and hyperlink to the terms of use were reasonably conspicuous when, *inter alia*, the notice and hyperlink were "spatially coupled with the mechanism for manifesting assent," even though they were located near the top of the screen and the "Purchase Subscription" button was located at the bottom of the screen).

Because the Registration Screen appears uncluttered, is visible at once, and the notice and bolded hyperlinks are reasonably conspicuous and spatially and temporally coupled with a user's creation of an account, the Court finds that the Registration Screen provided Plaintiffs "reasonably conspicuous notice" of the Terms "in light of the whole [interface]." *Edmundson*, 85 F.4th at 706 (alteration in original) (quoting *Nicosia*, 834 F.3d at 237).

### ii. Unambiguously manifested assent

Defendant first argues that Plaintiffs unambiguously manifested assent "given that [the Registration Screen] is shown as the user is creating an account — when they *expect* to be prompted to agree to the company's terms of service as part of the registration process." (Def.'s Amicus Reply 3.) Second, Defendant argues that Amici's arguments regarding, *inter alia*, "internal inconsistencies" in the Terms are questions of enforceability and not formation; questions that are explicitly delegated to the arbitrator. (Def.'s Suppl. Amicus Reply 4–6.) Third, Defendant argues that, even if Amici argue that the terms of a discrete subsection of the arbitration agreement is "inconsistent" or "convoluted," "they cannot deny that the parties mutually assented to arbitration in general" because the Terms "say in plain language" — printed in "all-caps at the top of the document" — that section 20 of the Terms contains an agreement to arbitrate and that all disputes between users and Defendant are to be resolved by binding and final arbitration. (Def.'s Amicus Reply 10.)

Plaintiffs argue that Defendant's Registration Screen "failed to put Plaintiffs on sufficient inquiry notice for registering, and logging into, accounts on the Temu App to manifest assent to Defendant's [Terms]." (Pls.' Opp'n 1.) In support, Plaintiffs note that "at no point, not even during initial registration, are users displayed [the] Terms . . . or asked to manifest their assent by clicking a box that says 'I agree,' or similar." (*Id.*)

32

Amici argue that, even if consumers had been given "adequate notice of the Terms, Defendant['s] attempt to enforce them would still fail because they are so convoluted and internally inconsistent that there could be no '"meeting of the minds" and "a manifestation of mutual assent,"' as required under New York law" because "[c]larity and conspicuousness of arbitration terms are important in securing informed assent." (Amicus Br. 16 (alteration in original) (first quoting *Starke*, 913 F.3d at 293; and then quoting *Specht*, 306 F.3d at 30).) In support, Amici argue that the "arbitration clause specifies that arbitration proceed through a novel 'batch' arbitration procedure, yet at the same time specifically states that claims shall proceed on an 'individual' basis and prohibits 'mass arbitration.'" (*Id.*; *see also* Suppl. Amicus Br. 11.) In addition, Amici argue that the AAA rules that the clause incorporates (1) "do not mention 'batch arbitration' at all," (2) do not provide for the charging of "one set of filing and administrative fees" for batches as provided by the Terms, and (3) allow the arbitrator, not the individual bringing the arbitration proceeding, to select the location of arbitration, and therefore "the AAA rules are in direct conflict with the Terms, which point consumers to the AAA's website and ask them to parse through the irreconcilable inconsistencies themselves." (Amicus Br. 17–18; *see also* Suppl. Amicus Br. 11–12.)

As to the second requirement of inquiry notice — unambiguous manifestation of assent — "acceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." *Edmundson*, 85 F.4th at 704 (quoting *Schnabel*, 697 F.3d at 128). "In other words, where an internet or smartphone user does not explicitly say 'I agree' to the contractual terms, a court must determine whether a reasonably prudent user would understand his or her conduct to constitute assent to those terms." *Id.* In making this determination, a court should consider:

33

> (1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms; and (3) the 'course of dealing between the parties,' including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms.

*Id.* at 704–05 (quoting *Schnabel*, 697 F.3d at 124).

The Court finds that Plaintiffs unambiguously manifested assent to the Terms. First, the Registration Screen "includes language signaling to users that they will be agreeing to [the Terms] through their conduct." *Id.* at 707. The notice specifically warns users that, "[b]y continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (Registration Screen.) This is a "clear prompt directing users to read the [Terms] and signaling that their acceptance of the benefit of registration would be subject to contractual terms."[12] *Meyer*, 868

---

[12] The Court finds unpersuasive Amici's argument that "the Temu prompt merely stated 'continue'" but did not state that "users were 'registering' or 'confirming' agreement to a 'plan' or 'creating an account'" and did not "require any payment," unlike the interfaces in *Meyer* and *Edmundson*, and therefore the prompt "is akin to the prompts involving 'vague references to "terms and conditions"' that 'undermine the conspicuousness of notice' . . . and a 'reasonably prudent smartphone user' would not 'understand that the terms were connected to the creation of a user account.'" (Suppl. Amicus Br. 5 (first quoting *Edmundson*, 85 F.4th at 706; and then quoting *Meyer*, 868 F.3d at 78); *see also* Amicus Br. 11, 13.) Courts in this Circuit have found that warning language similar to Defendant's was "a clear prompt to read the terms and conditions" even when the user was only registering their account, rather than making a purchase, and when the language did not explicitly use the words "registering" or "confirming." *See, e.g.*, *Peni v. Daily Harvest, Inc.*, No. 22-CV-5443, 2022 WL 16849451, at *4 (S.D.N.Y. Nov. 10, 2022) (registration buttons labeled either "Let's Go" or "View Plans + Pricing"); *Thorne v. Square, Inc.*, No. 20-CV-5119, 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022) (registration button labeled "Next"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 832 (S.D.N.Y. 2020) ("The hyperlink to the [terms] containing the arbitration provision at issue here is presented to users while signing up for the service, not while placing an order on a cluttered page or receiving a text-heavy email after making a purchase."). In addition, such explicit warning language differentiates it from cases with only "vague references" to terms and conditions. *See Soliman*, 999 F.3d at 832 ("Terms and conditions at subway.com/subwayroot/TermsOfUse.aspx"); *Arnaud v. Doctor's Assocs. Inc.*, 821 F. App'x 54, 56–57 (2d Cir. 2020) ("T & Cs"); *Starke*, 913 F.3d at 294 ("Terms & Conditions").

F.3d at 79; *see also Edmundson*, 85 F.4th at 707; *Peni*, 2022 WL 16849451, at *4 (holding that the language of the warning — "[b]y clicking above, you agree to our <u>Terms of Use and Terms of Sale</u>, and consent to our <u>Privacy Policy</u>" — was "a clear prompt directing users to review the Terms of Use, Terms of Sale, and Privacy Policy" and concluding that the plaintiff "manifested assent to the Terms of Use by clicking the registration button and creating an account"); *Thorne v. Square, Inc.*, No. 20-CV-5119, 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022) (concluding that "the warning language that '[b]y entering, you agree' was a 'clear prompt directing users to read the [hyperlinked terms of service] and signaling that' registering for Cash App 'would [make one] subject to contractual terms" (alterations in original)); *Feld*, 442 F. Supp. 3d at 831 ("[T]he language of the notice that by 'clicking the Sign Up or Facebook button, you agree to [the] **Terms of Service** and **Privacy Policy**' put reasonably prudent users on inquiry notice."); *see also Graham*, 2023 WL 6037974, at *5 (finding that the warning language — "[b]y submitting my information, I agree to the <u>Privacy Policy</u> and <u>Terms of Service</u> and to receive offers and promotions from [the defendant]" — was "a clear prompt to read the terms and conditions and signal[ed] to a user that purchase will bind them to those terms").

Second, as discussed above, the notice and hyperlinks to the Terms and privacy policy are presented on the initial registration screen when a user first creates an account, which is a location and time when the user would expect to receive such terms. *See Schnabel*, 697 F.3d at 127 ("[T]he presentation of [non-negotiable contract] terms at a place and time that the consumer will associate with the initial purchase or enrollment . . . indicates to the consumer that he or she is taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her."); *see also Meyer*, 868 F.3d at 80 ("The fact that clicking the register button had two functions — creation of a user account and assent to the Terms of Service — does not render [the user's] assent ambiguous.").

35

Third, "[t]he transactional context of the parties' dealings reinforces" that Plaintiffs unambiguously manifested assent because they "located and downloaded the [Temu] App" and "signed up for an account," and such a "registration process clearly contemplate[s] some sort of continuing relationship between the putative user and [the defendant], one that would require some terms and conditions." *Meyer*, 868 F.3d at 80. In addition, Plaintiffs were presented with the notice and hyperlink to the Terms each time they logged in to the Temu App, (*see* Trinh Decl. ¶ 8 ("If a user subsequently logs out from the Temu App after registering an account, then, each time they log back in, the user again is shown the Registration [Screen] and must assent to the Terms, by inputting their credentials and pressing one of the 'Continue' options.")), and assent may be shown through "repeated exposure to the terms and conditions," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 431 (2d Cir. 2004); *McDaniel v. Home Box Off., Inc.*, No. 22-CV-1942, 2023 WL 1069849, at *3 (S.D.N.Y. Jan. 27, 2023) (finding that the plaintiffs assented to the defendant's terms of use when they "never attempted to cancel their subscriptions and obtain a refund after receiving notice of the terms, . . . continued to renew their . . . subscription," and "purchased a new subscription [through a different provider]," which required one plaintiff to "once again agree[] to the [terms] during the sign-up process"); *Thorne*, 2022 WL 542383, at *12 ("[L]ike in *Meyer*, '[t]he transactional context of the parties' dealings' — [the plaintiff]'s enrollment and use of Cash App's services — reinforces the court's conclusion: [the plaintiff] manifested assent to the Cash App terms of service." (quoting *Meyer*, 868 F.3d at 80)); *cf. Starke*, 913 F.3d at 296 (noting that although the plaintiff transacted with the defendant "on six prior occasions," the post-sale email sent to him after his transactions did not provide "clear and conspicuous notice that the transaction would subject him to binding arbitration" and therefore, the plaintiff did not manifest assent).

36

Amici's argument that the inconsistency of the Terms prevents users from unambiguously manifesting assent fails because the relevant inquiry is "whether a reasonably prudent user would understand his or her conduct to constitute assent" to the Terms, *Edmundson*, 85 F.4th at 704, not whether the Terms are enforceable or unconscionable because of a lack of clarity or internal inconsistencies. At the time of registration and creation of their Temu accounts, Plaintiffs were warned that "[b]y continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (Registration Screen.) At that time, they had the ability to review the Terms and, if they disagreed with or found such Terms to be "convoluted and internally inconsistent," (Amicus Br. 16), they had the opportunity to stop before creating a Temu account, *see Register.com*, 356 F.3d at 430 ("A party cannot manifest assent to the terms and conditions of a contract prior to having an opportunity to review them; a party must be given some opportunity to reject or assent to proposed terms and conditions prior to forming a contract."). However, by continuing, Plaintiffs unambiguously manifested assent to the Terms, including the arbitration agreement. *See Meyer*, 868 F.3d at 79–80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); *Peni*, 2022 WL 16849451, at *5 ("[The plaintiff] manifested assent to the Terms of Use by clicking the registration button and creating an account . . . ."); *Thorne*, 2022 WL 542383, at *12 ("A reasonable user would know that by entering the six-digit sign-in code and completing her Cash App registration, she was agreeing to the terms and conditions accessible via the hyperlink, whether she clicked on the hyperlink or not."); *Feld*, 442 F. Supp. 3d at 832 ("By signing up for [the defendant's] service, [the plaintiff] manifested assent to the [terms], even if she did not click on the hyperlink to read the contract."); *see also Edmundson*, 85 F.4th at 707 ("[The plaintiff] unambiguously manifested assent to [the

37

defendant]'s terms when . . . she selected 'Confirm and continue' to finalize her GameStop purchase using [the defendant]'s 'Pay in 4' service.").

After balancing the factors, the Court finds that the Registration Screen provided Plaintiffs "reasonably conspicuous notice" of the Terms, and Plaintiffs, through their conduct, unambiguously manifested assent to the Terms.  Accordingly, Plaintiffs and Defendant entered into an agreement to arbitrate.

### d.    The parties delegated questions of arbitrability to the arbitrator

Defendant first argues that "[c]ourts enforce valid arbitration agreements so long as the dispute at issue comes within their scope" and Plaintiffs' claims fall within the scope of Defendant's arbitration agreement.  (Def.'s Mem. 10–12.)  In support, Defendant argues that the arbitration agreement is "broad, covering 'any dispute . . . arising out of or relating to' Plaintiffs' use of Temu."  (*Id.* at 11 (quoting Terms § 20.1).)  Defendant further argues that "Plaintiffs' claims plainly 'arise from' or 'relate to' their use of" the Temu App because (1) "Plaintiffs' proposed nationwide class definition consists of '[a]ll persons residing in the United States who registered an account with Temu,'" and (2) "Plaintiffs allege they were harmed because [Defendant] 'intentionally design[ed] the Temu App, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain Plaintiffs' and the Class's private and personally identifiable data and content.'"  (*Id.* at 11 (first and third alterations in original) (quoting Am. Compl. ¶¶ 174, 320).)  Second, Defendant argues that "[e]ven if there were any doubt that Plaintiffs' claims fall within the arbitration [agreement]'s scope, those questions must be resolved in arbitration, given that the Terms provide that the arbitrator shall have 'exclusive authority' to determine the arbitration [agreement]'s enforceability and scope."  (*Id.* at 12 (first alteration in original) (quoting Terms § 20.7); *see also* Def.'s Amicus Reply 8–9 (arguing that "any challenges to the arbitration agreement's specific

38

provisions as vague, unconscionable, or unenforceable . . . must . . . be made in arbitration" because "Temu's arbitration agreement provides that '[t]he arbitrator shall have exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the *interpretation* or application of the Arbitration Agreement, including the *enforceability*, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement'" (alteration in original) (quoting Terms § 20.7)).)  Third, Defendant argues that Amici "have not challenged the delegation provision." (Def.'s Suppl. Amicus Reply 6.)  Finally, Defendant argues that Amici's challenges to the arbitration agreement are baseless.  (Def.'s Amicus Reply 9–20.)

Amici argue that the arbitration agreement is unenforceable, internally inconsistent, and procedurally and substantively unconscionable.  (Amicus Br. 15–25.)  Amici first argue that the arbitration agreement is unenforceable under the plain language of the Terms because "Section 20.11 provides that the entire arbitration clause is unenforceable if the batch arbitration provisions in Section 20.9 are invalidated" and "two courts have ruled the batch arbitration provision (and the rest of the Terms) — are unenforceable." (*Id.* at 15.)  Second, Amici argue that the arbitration agreement lacks clarity and is internally inconsistent because "there are multiple areas in which the arbitration clause is at odds with the AAA rules that govern the arbitration." (*Id.* at 16–18; *see also* Suppl. Amicus Br. 9–12.)  Third, Amici argue that the arbitration agreement is procedurally unconscionable because (1) individuals are required to parse through the Terms and separately posted AAA rules and the inconsistencies between the two "make it impossible for an ordinary consumer to understand its terms," and (2) Defendant has amended the arbitration clause many times, including "switching the company that provides arbitration services, which resulted in a wholesale change in the rules that would govern the arbitration." (Amicus Br. 19–21; *see also* Suppl. Amicus Br. 13–15.)  Finally, Amici argue that

39

the arbitration agreement is substantively unconscionable because it "is purposefully designed to make resolution of large numbers of relatively low-dollar consumer claims impractical" and requires "millions of individual consumers to jump through a series of costly, time-consuming, and one-sided procedures designed to frustrate consumers' ability to recover." (Amicus Br. 21–25; *see also* Suppl. Amicus Br. 15–19.)

As Justice Ketanji Brown Jackson recently explained in *Coinbase*, the parties may agree to "send the merits of a dispute to an arbitrator," and, "[a] contest over 'the merits of the dispute' is a first-order disagreement." *Coinbase*, 144 S. Ct. at 1192–93 (quoting *First Options*, 514 U.S. at 942). In addition, "[t]he parties may also have a second-order dispute — 'whether they agreed to arbitrate the merits' — as well as a third-order dispute — 'who should have the primary power to decide the second matter.'" *Id.* (quoting *First Options*, 514 U.S. at 942). Regarding a third-order dispute, "[t]he question [of] whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 153 (2d Cir. 2021) (second alteration in original) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)); *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) ("'Questions of arbitrability' is a term of art covering 'dispute[s] about whether the parties are bound by a given arbitration clause' as well as 'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.' Those issues should be decided by the courts unless 'there is *clear and unmistakable evidence* from the arbitration agreement . . . that the parties intended that [they] be decided by the arbitrator.'" (first quoting *Howsam*, 537 U.S. at 83–85; and then quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002))). Thus, "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence

40

that they did so.'" *Henry Schein*, 586 U.S. at 72 (quoting *First Options*, 514 U.S. at 944). When a delegation clause exists, a court may not disturb the parties' delegation unless a party directly challenges the delegation clause itself. *Rent-A-Ctr.*, 561 U.S. at 71; *Paguay v. ESH Rest. Grp. LLC*, No. 23-CV-8434, 2024 WL 1376163, at *2 (S.D.N.Y. Apr. 1, 2024) ("If the arbitration agreement includes a clause that delegates decisions of arbitrability to the arbitrator, [a c]ourt should only intervene if the basis of the non-movant's challenge is directed specifically to enforceability of the delegation clause."); *Morehouse v. PayPal Inc.*, No. 21-CV-4012, 2022 WL 912966, at *7 (S.D.N.Y. Mar. 28, 2022) ("When a delegation provision exists, 'a court may not intervene unless a party challenges the delegation provision specifically.'" (quoting *Bolden v. DG TRC Mgmt. Co.*, No. 19-CV-3425, 2019 WL 2119622, at *6 (S.D.N.Y. May 15, 2019))).

### 1.    The delegation clause is clear and unmistakable

Questions of arbitrability must be decided by an arbitrator because section 20.7 of the Terms provides "clear and unmistakable evidence" that the parties agreed to arbitrate these questions. *See New Prime v. Oliveira*, 586 U.S. 105, 111–12 (2019) ("A delegation clause gives an arbitrator authority to decide even the initial question whether the parties' dispute is subject to arbitration."); *Henry Schein*, 586 U.S. at 72 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."). Section 20.7 specifically delegates "exclusive authority" to an arbitrator to resolve any dispute "arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement." (Terms § 20.7.) Courts have consistently found that similarly broad delegation clauses provide clear and unmistakable evidence of the parties' intent to delegate. *See Rent-A-Ctr.*, 561 U.S. at 65 (finding that a delegation clause providing that "[t]he [a]rbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this [a]greement"

41

delegated to the arbitrator the question of whether the arbitration agreement was unconscionable (first alteration in original)); *Palmer v. Starbucks Corp.*, --- F. Supp. 3d ---, ---, 2024 WL 2779032, at *9 (S.D.N.Y. May 28, 2024) (finding that the delegation language — "[e]xcept as provided below, [the parties] agree that the [a]rbitrator — and not a court or agency — shall have exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of this [a]greement, including any claim that all or part of this [a]greement is void or voidable" — "clearly delegates the question of arbitrability to the arbitrator"); *Marino v. CVS Health*, 698 F. Supp. 3d 689, 696 (S.D.N.Y. 2023) (finding that the delegation clause — "[c]overed [c]laims also include dispute arising out of or relating to the validity, enforceability or breach of this [p]olicy, except as provided in the section below regarding the [c]lass [a]ction [w]aiver" — "clearly and unmistakably elect[ed] to have the resolution of the arbitrability of the dispute decided by the arbitrator" (quoting *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019))); *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 28 (E.D.N.Y. 2023) (finding that the delegation clause — "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision" — "evinces a clear and unmistakable intention to delegate the question of arbitrability to the arbitrator" and collecting cases that held the same with respect to identical language (citation and emphasis omitted)), *aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024); *Spates v. Uber Techs., Inc.*, No. 21-CV-10155, 2023 WL 3506138, at *3 (S.D.N.Y. Mar. 31, 2023) (upholding as clear and unmistakable evidence of delegation to the arbitrator the parties' provision stating that "the arbitrator . . . shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this [a]rbitration [a]greement" and "shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the [t]erms are unconscionable"); *see also Coinbase*, 144 S. Ct. at 1191 (noting that a delegation

42

provision providing that "[t]his [a]rbitration [a]greement includes, without limitation, disputes arising out of or related to the interpretation or application of the [a]rbitration [a]greement, including the enforceability, revocability, scope, or validity of the [a]rbitration [a]greement or any portion of the [a]rbitration [a]greement" and that "[a]ll such matters shall be decided by an arbitrator and not by a court or judge" "clearly sends to arbitration disputes between [the plaintiff] and [the defendant's] users, including disputes about arbitrability").

### 2. Neither Plaintiffs nor Amici directly challenge the delegation clause

Neither Plaintiffs nor Amici directly challenge the delegation clause, and therefore the Court must treat it as valid. *See Rent-A-Ctr.*, 561 U.S. at 68, 72 (finding that a court must treat a delegation provision, such as "[t]he [a]rbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this [a]greement," as "valid" and "enforce[able]" unless a party "challenge[s] the delegation provision specifically"); *Greene v. Kabbalah Centre Int'l, Inc.*, 625 F. Supp. 3d 3, 17 (E.D.N.Y. 2022) (finding that the plaintiffs "only ma[de] a series of general attacks on the [agreements] as a whole on the basis of conscionability," and "the assertion of undue influence is lodged against the [agreements] as a whole — not the delegation provision specifically"); *Faith v. Khosrowshahi*, No. 21-CV-6913, 2023 WL 5278126, at *8 (E.D.N.Y. Aug. 16, 2023) (rejecting a challenge to a delegation clause because the plaintiff "challenge[d] the [agreement] as a whole, and not the delegation clause of the arbitration provision alone"); *cf. Hastings v. Nifty Gateway, LLC*, --- F. Supp. 3d ---, ---, 2024 WL 1175196, at *5 (S.D.N.Y. Mar. 19, 2024) ("[Plaintiff] does specifically challenge the [d]elegation [c]lause, which permits the [c]ourt to 'intervene.'" (quoting *Bolden*, 2019 WL 2119622, at *6)). Although Amici challenge various aspects of the arbitration agreement, such as arguing that the batch arbitration clause and various procedural prerequisites to arbitration are substantively

unconscionable, (*see* Amicus Br. 21–25; *see also* Suppl. Amicus Br. 15–19), they do not specifically challenge the delegation clause. Therefore, the Court must treat the delegation clause as valid and enforceable. *See Rent-A-Ctr.*, 561 U.S. at 72–73 (rejecting the plaintiff's unconscionability argument because it "clearly did not go to the validity of the delegation provision"); *Faith*, 2023 WL 5278126, at *8 (finding that the plaintiff "raise[d] only a substantive unconscionability argument regarding the fees associated with arbitration" and "d[id] not specifically challenge the delegation clause as unconscionable," and concluding that the court "must treat [the delegation clause] as valid under the FAA"); *McCoy v. Dave & Buster's, Inc.*, No. 15-CV-465, 2018 WL 550637, at *8 (E.D.N.Y. Jan. 24, 2018) (deferring enforceability challenges to the arbitrator because the plaintiff did "not separately challenge the enforceability of the delegation clauses"); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) (explaining that the court's inquiry was "limited to unconscionability challenges aimed specifically at the delegation clause in the arbitration agreement").

Accordingly, because the delegation clause provides "clear and unmistakable evidence" that the parties agreed to arbitrate disputes regarding questions of arbitrability, and neither Plaintiffs nor Amici challenge the delegation clause specifically, the Court must treat the delegation clause as valid and defer any questions of arbitrability to the arbitrator.[13]

---

[13] Because the Court grants Defendant's motion to compel arbitration and stays the case pending resolution of arbitration, the Court declines to consider Defendant's additional argument that Plaintiffs "waived their rights to bring claims against [Defendant] on a classwide basis" because of the class action waiver contained in Section 20.4 of the Terms. (*See* Def.'s Mem. 4, 12.)

### III. Conclusion

For the foregoing reasons, the Court grants Defendant's motion to compel arbitration as to all of Plaintiffs' claims.  The Court stays this case pending resolution of Plaintiffs' claims in arbitration.

Dated: October 1, 2024
       Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge
